FILED
2017 Dec-15  PM 06:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE

# NORTHERN DISTRICT OF ALABAMA

# JASPER DIVISION

| | | |
|---|---|---|
| **DANA COOPER,** | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION NO:** |
| **v.** | ) | |
| | ) | **6:16-CV-01746-TMP** |
| **WALKER COUNTY E-911,** | ) | |
| **Defendant.** | ) | |

## WALKER COUNTY E-911'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

COMES NOW the Defendant, Walker County E-911, and submits the following statement of undisputed facts and brief in support of its Motion for Summary Judgment on all of Plaintiff's claims.

## TABLE OF CONTENTS

I.    STATEMENT OF UNDISPUTED FACTS…………………………… 1

II.   STANDARD OF REVIEW……………………………………….. 18

*Celotex Corp. v. Catrett*
477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*
475 U.S. 574, 586, 89 L. Ed. 538, 106 S. Ct. 1348 (1986)

*Vega v. Invsco Group, Ltd.*
432 F. App'x 867, 869-70 (11th Cir. 2011)


III.   LEGAL ARGUMENT………………………………………………  19

A. Introduction………………………………………………………  19

*Duble v. Fed Ex Ground Package System, Inc.*
572 Fed.Appx. 889 (11th Cir. 2014)

B. Cooper Cannot Establish That She Meets the Statutory
Definition of Disabled…………………………………………27

*Mazzeo v. Color Resolution Int'l, LLC*
746 F.3d 1264, 1268 (11th Cir. 2014)

*Bagwell v. Morgan Cnty. Comm'n*
676 Fed. Appx. 863, 868 (11th Cir. 2017)

*Wetherbee v. S. Co.*
423 Fed. Appx. 933, 934 (11th Cir. 2011)

42 U.S.C. § 12111(8)

*Samson v. Fed. Exp. Corp.*
746 F.3d 1196, 1200-01 (11th Cir. 2014)

*D'Angelo v. ConAgra Foods, Inc.*
422 F.3d 1220, 1230 (11th Cir. 2005)

C. Assuming that Cooper Met the Statutory Definition of Disabled,
There Is No Evidence to Support Her ADA Failure to
Accommodate Claim………………………………………………….24

*Terrell v. USAir*
132 F.3d 621, 624 (11th Cir. 1998)

*Willis v. Conopco, Inc.*
108 F.3d 282, 83, 286 (11th Cir. 1997)

*Schwertfater v. City of Boynton Beach*
42 F. Supp. 2d 1347, 1357 (SD. Fla. 1999)

*Stewart v. Happy Herman's Cheshire Bridge, Inc.*
117 F.3d 1278, 1286 (11th Cir. 1997)

*Lucas v. W.W. Grainger, Inc.*
257 F.3d 1249 (11th Cir. 2001)

D.   There Is No Evidence to Support Plaintiff's FMLA
     Interference Claim……………………………………………26

        *Rudy v. Walter Coke, Inc.*
        21 F.Supp.3d 1228, 1238 (N.D. Ala. 2014)

        29 U.S.C.A. § 2614(a)(3)(B)

        29 C.F.R. § 825216(a)(1)

        *Strickland v. "Water Works & Sewer Bd.*
        239 F.3d 1199, 1208 (11th Cir. 2001)

        29 U.S.C. § 2615(a)(1)

        *Harley v. Health Ctr. of Coconut Creek*
        487 F.Supp.2d 1344, S.D. Fla. 2006)

E.   Cooper's FMLA Retaliation Claim Fails as a Matter of Law Because
     There is No Evidence that Walker County E-911's Reasons for Her
     Non-Discriminatory Termination are a Pretext for
     Discrimination…………………………………………………..28

        *Bentley v. Orange Cnty., Fla.*
        445 Fed. Appx. 306, 309 (11th Cir. 2011)

        *Hurlbert v. St. Mary's Health Care System, Inc.*
        439 F.3d 1286, 1297 (11th Cir. 2006)

*Gilliard v. Ga. Dep't of Corrs*.
500 Fed. Appx. 860, 864 (11th Cir. 2012)

*E.E.O.C. v. Total System Services, Inc.*
221 F.3d 1171, 1176 (11th Cir. 2000)

F.   Plaintiff's 42 U.S.C. 1983 and State Law Due Process Claims
     Fail Because Cooper was an "At Will" Employee and as Such
     Had No Protected Property Interest in Continued Employment…….31

*Board of Regents of State Colleges v. Roth*
408 U.S. 564, 571, 92 S.Ct 2701, 33 L.Ed.2d 548 (1972)

*Barnes v. Zaccari*
669 F.3d 1295, 1303 (11th Cir. 2012)

*Ross v. Clayton County, Ga.*
173 F.3d 1305, 1307 (11th Cir. 1999)

*Nicholson v. Gant*
816 F.2d 591, 597 (11th Cir. 1987)

*Harper v. Winston County*
892 So.2d 346, 351 (Ala. 2004)

*Mack v. Arnold*
929 So.2d 480, 483-84 (Ala.Civ.App.2005)

*Brett v. Jefferson County, Ga.*
123 F.3d 1429, 1434 (11th Cir. 1997)

*Stough v. Gallagher*
967 F.2d 1523, 1530 (11th Cir. 1992)

G. Walker County E-911 is a State Agency Entitled to Eleventh
Amendment Immunity……………………………………………33

*Century Tel of Alabama, LLC v. Dothan/Houston County
Communications District*
179 So.3d 456, 458 (Ala. 2015)

*Ross v. Jefferson County Dept. of Health*
701 F.3d 655, 660 (11th Cir. 2012)

*Miccosukee Tribe of Indians of Fla. V. Fla. State Athletic
Comm.*
226 F.3d 1226, 1231-34 (11th Cir. 2000)

*Shands Teaching Hospital and Clinics, Inc. v. Beech Street
Corporation*
208 F.3d 1308, 1311 (11th Cir. 2000)

*Tuveson v. Fla. Governor's Council on Indian Affairs, Inc.*
734 F.2d 730, 732 (11th Cir. 1984)

Code of Alabama, 1975 § 11-8-4.1

Code of Alabama, 1975 § 11-98-5.2

*Coleman v. Court of Appeals of Maryland*
556 U.S. 30 (2012)

*Board of Trustees of University of Alabama v. Garrett*
531 U.S. 356, 368 (2001)

III.    CONCLUSION……………………………………………………35

CERTIFICATE OF SERVICE……………………………………………37

## I.  <u>STATEMENT OF UNDISPUTED FACTS</u>

1.     Defendant Walker County E-911 is an emergency communications District formed in accordance with the Emergency Telephone Service Act, § 11-98-1 et seq., Ala. Code 1975 and is governed by a seven (7) member Board of Directors.  (Walden Decl., ¶2)

2.     Walker County E-911 is a political and legal subdivision of the State of Alabama and receives all of its funding from the State of Alabama 911 Board.  (Id.)

3.     Dana Cooper applied for employment as a 911 Emergency Dispatcher with Walker County E-911 by submitting and signing a Job Application on August 17, 2009, in which she agreed to conform to Walker County E-911's rules and regulations, and agreed that her employment can be terminated "with or without cause, and with or without notice, at any time" at either her or Walker County E-911's option.  (Id., ¶4, Exh.A).

4.     The essential job duties of an emergency E-911 dispatcher include answering emergency 911 calls and contacting and dispatching emergency first responders and guiding those first responders to medical and other emergencies. (Id., ¶5).

5.     Dana Cooper was employed as a 911 Dispatcher on the night shift from 2009 until August, 2014.  On August 5, 2014, Cooper was given a verbal

1

warning for not listening to 911 callers and incorrectly logging 911 information. On August 12, 2014, Cooper was transferred from night shift, which is from 7:00 p.m. to 7:00 a.m., to day shift in order to give her additional training in 911 call-taking. The day shift has a much heavier call volume than night shift and Cooper was transferred to day shift to provide her with heavier call volume training. On August 14, 2014, Cooper's day shift supervisor, Sherrea Chamness, issued a verbal warning to Cooper and another dispatcher for failure to handle a call correctly. (Id., ¶¶6, 8).

6.    On August 26, 2014 Cooper requested FMLA leave and Walker County E-911 prepared a Notice of Eligibility under the FMLA and provided it to Cooper. (Id., ¶12, Exh. J).

7.    Dana Cooper submitted an FMLA Leave report form to Walker County E-911 on September 3, 2014, and Walker County E-911 granted her FMLA leave. (Id., ¶13, Exh. K).

8.    Dana Cooper did not work any of her assigned shifts from August 26, 2014 through September 10, 2014. On September 10, Cooper provided a note from her doctor, Dr. Anitra Batie, which authorized her to return to work with no medical restrictions on September 11, 2014. Cooper returned to work on September 11, 2014. (Id., ¶14).

9.     On September 22, 2014, Dana Cooper was given a Final Written Warning for excessive personal telephone use while on 911 duty by her supervisor, Sherrea Chamness.  (Id., ¶7, Exh. C).

10.     Cooper admits that the written warning she received on September 22, 2014 for excessive personal telephone calls while at work was a correct evaluation of her conduct.  (Cooper Depo., 158:9-16; 159:22-23, Exhibit 10).

11.     Cooper's immediate supervisor, Sherrea Chamness, issued Cooper a written warning on September 29, 2014, for failure to log 911 calls correctly and failure to listen to the caller.  Cooper "took it as a learning tool" and did not think that she was being "picked on."  (Cooper Depo., 161:11-23; 162:1-7; 163:12-18).

12.     On September 30, 2014 Cooper became ill before the end of her shift and asked her direct supervisor, Sherrea Chamness, if she could leave early. Chamness granted Cooper's request to leave early but after consulting Director Wilson on the phone to confirm, told Ms. Cooper that since she was not scheduled to work on October 1 and 2, 2014, she would need a doctor's excuse pursuant to Walker E-911 policy.  This led to Dana Cooper arguing with her Supervisor in the dispatch room and adjoining kitchen area in which Cooper repeatedly called the leave policy ridiculous, that everything was at the Director's discretion and disturbed other 911 dispatchers who were taking a number of serious 911 calls at the time.

3

13.   Each of the 911 dispatchers and the supervisor who were on duty on September 30, 2014 during the incident between Cooper and her supervisor prepared written statements concerning the incident.   These statements were reviewed by Roger Wilson and Rhonda Walden, who was second-in-command as Administrator Assistant, in making a determination concerning what personnel action to take regarding Cooper.  (Walden Decl., ¶9).

14.   Walker County E-911 has applied this policy to require written doctor's excuses from other 911 dispatchers and from Rhonda Walden when they have taken off for shifts prior to a scheduled off shift.  (Walden Decl., ¶18, Exh. O, P)

15.   Roger Wilson and Rhonda Walden, the Administration Assistant, met on October 1, 2014 to discuss possible disciplinary action concerning Dana Cooper for the September 30 incident and reviewed the following:

Statement of Emily McDonald (Attached as Exhibit E);

Statement of Amanda Harbin (Attached Exhibit F);

Statement of Chad Burttram (Attached as Exhibit G);

Statement by Dana Cooper's Shift Supervisor, Sherrea Chamness (Attached as Exhibit H).

A video recording of the September 30, 2014 incident at Walker County E-911 involving Dana Cooper and her Shift Supervisor, Sherrea Chamness.

4

The Employee Discipline Warning Notice dated September 22, 2014 for Dana Cooper (Attached as Exhibit C).

The Employee Discipline Warning Notice for Dana Cooper dated September 29, 2014 regarding Dana Cooper (Attached as Exhibit D).

The Standard Operating Procedures ("SOP") for Walker County E-911 involving request for leave and the need for a doctor's excuse (Attached hereto as Exhibit I).  (Id., ¶9, Exhibits C, D, E, F, G, H, I).

16.    After reviewing the written statements of the Dispatchers and Shift Supervisor on duty on September 30, 2014, the disciplinary warning notices for Dana Cooper dated September 22 and September 29, 2014, the video of the September 30 incident and Walker County E-911 policy, the Director Roger Wilson made the decision on October 1, 2014 to terminate Dana Cooper and Walden agreed with that decision as Administration Assistant.  Walden agreed with the Director's decision based in part on Dana Cooper's 911 dispatcher performance in failing to take calls correctly, but primarily on Ms. Cooper's deliberate acts of insubordination toward her supervisor, Sherrea Chamness, in arguing with her openly about Walker County E-911 leave policy in the 911 dispatch room which disturbed other 911 dispatchers who were attempting to handle a serious emergency situation which involved a multiple vehicle wreck with injuries which required air ambulance notification.

17.     Roger Wilson called Dana Cooper on October 1, 2014 and asked her to come in to meet with him on October 2, 2014 at 10:00 a.m.  Since Cooper was not scheduled to work on October 1 or 2, she thought it was possible that Wilson was going to terminate her on October 2 and went to see Dr. Batie for a work excuse at 8:30 a.m. on October 2 before her meeting with Wilson.  (Cooper Depo. 129:11, 15-23; 130:1-17; 16:16-21).

18.     Cooper met with Roger Wilson and Rhonda Walden in Wilson's office on October 2, 2014 and she was informed of her termination. (Walden Decl., ¶10).

19.     After Cooper was terminated, she submitted a document which she styled as a Grievance to Walker County E-911 requesting a hearing before Walker County E-911's Board of Directors.   Walker County E-911 did not conduct a hearing by the Board of Directors because its policy for grievances applies only to employees and it is not a procedure available for post-termination hearings by the Board since those individuals are no longer considered employees of Walker County E-911.  (Stockman Depo., 90:11, 18-23 91:11, 22-23; 92:1.1).

20.     The only accommodation which Dana Cooper asked for due to her medical condition was time off work beginning August 26, 2014, which was granted by Walker County E-911.  Cooper asked to return to work and provided a doctor's note releasing her to work without any medical restrictions beginning

September 11, 2014.  Cooper again asked for an accommodation for her medical condition to leave work on September 30, 2014, which was granted by Walker County E-911.  (Cooper Depo., 154:12-23; 155:1-11; 233:20-23).

21.    Cooper testified that, although it was her opinion that getting leave from work became more difficult after she got FMLA leave in August, she agreed that it was always not easy for any employee of Walker County E-911 to obtain leave from work.  (Cooper Depo., 187:23; 188:1-10).

22.    Cooper agreed that all Walker County E-911 dispatchers' calls are scrutinized very carefully and they are written up for doing things that are incorrect in taking calls and this is a part of being a 911 dispatcher.  (Cooper Depo., 239:11-23; 240:1-3).

23.    Cooper has no evidence that Roger Wilson told her direct supervisor, Sherrea Chamness, to write her up for making excessive personal telephone calls in September, 2014.  (Cooper Depo., 241:1-21).

24.    Cooper has no evidence that she was treated unfairly in any way by Walker County E-911 between the time she returned to work on September 11, 2014 through September 29, 2014.  (Cooper Depo., 190:7-13).

25.    Cooper testified that beginning in early April, 2014, about six months prior to her termination, she began experiencing seizures.  (Cooper Depo., 72:21-23; 73:1-3).

26.     Cooper never had a seizure on the job at Walker County E-911. (Cooper Depo., 72:12-16).

27.     Cooper testified that she had had seizures in 2012, which did not interfere with her work at Walker County E-911 at all.  (Cooper Depo., 79:14-18).

28.     Cooper testified that she had had a seizure around 2005 or 2006, about six or seven years prior to 2014.  (Cooper Depo., 80:17-18; 81:6-9).

29.     Cooper testified that she had her first seizure when she was seven (7) years old in 1981.  (Cooper Depo., 82:9-13).

30.     Cooper testified she only had one seizure in 2004.  (Cooper Depo., 84:5-7).

31.     Cooper testified she had three seizures in 2012, in which she felt light headed and had a very strange aura.  She feels a strange sensation and then goes to the ground.  She does not know if she passes out or if she is conscious because she does not have any memory or recollection of what happens during the time of the seizure.  Cooper testified that her husband has told her that sometimes when she has a seizure she bites her tongue and the side of her cheek and that she shakes violently and is incredibly strong during her seizures.  (Cooper Depo., 87:1-23; 88:1-23; 89:1-20).

32.    Cooper does not know whether she passes out during her seizures or not and has no recollection of what happens during her seizures.  (Cooper Depo., 89:18-22).

33.    Cooper testified that her husband has described her having jerking movements of her arms and legs during a seizure episode and that she has not simply passed out or fainted on the floor.  (Cooper Depo., 91:4-10).   Cooper never has any recollection of anything that has happened during one of her seizures. (Cooper Depo., 91:11-21).

34.    When Cooper has what she described as "grand mal" seizures, she bites her tongue and cheek.  She has a loss of consciousness for a lot longer than thirty seconds or one minute and it takes her hours to come out of the seizure and regain consciousness.  She has severe soreness the following day after a grand mal seizure.   Cooper testified that when she has a pseudo seizure, the seizure lasts about thirty seconds to one minute and it takes her about fifteen or twenty minutes to recover full consciousness from the seizure.   She never had either one of these seizures while working at Walker County E-911.  (Cooper Depo., 195:6-18).

35.    Before having a seizure, Cooper smells strange smells and feels a weird aura.  She later finds herself on the floor and does not know anything about what has happened during the seizure when she wakes up.  (Cooper Depo., 194:11-18).

36.     Cooper has had "multiple hundreds" of seizures since she was terminated by Walker County E-911 on October 2, 2014.  (Cooper Depo., 197:17-23; 198:1).

37.     After both of what Cooper describes as pseudo seizures and grand mal seizures, she is lethargic and confused for about thirty minutes after a pseudo seizure and for longer after a grand mal seizure, about an hour to recover.  (Cooper Depo., 198:2-21).

38.     Keith Cooper, Dana Cooper's husband at the time she worked at Lowe's, testified that Cooper was forced to resign from Lowe's due to having seizures on the job.  (Keith Cooper Depo., p. 20:11, 9-14)).

39.     Cooper agreed that when she applied for Social Security disability in 2014 or 2015, she was claiming that she was physically unable to work at all, whether it be Walker County E-911 or anywhere else.  (Cooper Depo., 206:3-9).

40.     Cooper admits that she was "perturbed" at her direct supervisor, Chamness, when Chamness told her that she would need a doctor's excuse on September 30, 2014, and admits telling her supervisor that the policy was "ridiculous."  (Cooper Depo., 244:1-17).

41.     Cooper testified that she did not have a seizure on September 30, 2014 at Walker County E-911, but she had a seizure later that afternoon or the next day, she is not sure.  (Cooper Depo., 134:9-23; 135:1-14).

42.     Cooper testified that she had two seizures on October 1, 2014. (Cooper Depo., 138:4-9).

43.     Cooper has no recollection one way or the other whether she told the Director, Roger Wilson, that she had had seizures.  (Cooper Depo., 140:1-15).

44.     Dr. Batie referred Dana Cooper to Dr. Paul Gilreath on October 2, 2014.  Dr. Gilreath is a neurologist.  (Cooper Depo., Exhibit 11; Dr. Gilreath's Deposition, 9:7-16).

45.     Dr. Gilreath also saw Dana Cooper on October 28, 2014.  (Gilreath Depo., 64:8-10).

46.     Cooper described her seizures to Dr. Gilreath as occurring with an aura of feeling somewhat dazed, lasting a few seconds, followed by a loss of consciousness.  If she is standing, she will fall to the ground and then proceeds into witnessed loss of consciousness, closing of the eyes, moaning, and poor extremity diffuse jerking and stiffening with some flailing about the head also.  She also experiences rare urinary incontinence, tongue or cheek biting.  The seizure usually lasts about sixty seconds and then resolves and takes about thirty minutes for her to get back to baseline, during which time she is confused and lethargic.  Cooper stated to Dr. Gilreath that her seizures were aggravated by significant stress. (Gilreath Depo., 19:15-23; 20:1-18).

47.     It was Dr. Gilreath's opinion that Dana Cooper was not experiencing epileptic seizures, given that Cooper said that she had a seizure during the encephalograph and the EEG did not show evidence of seizure activity.  (Gilreath Depo., 66:10-18).

48.     Dr. Gilreath testified that Cooper's description of her seizures concerning closing her eyes and moaning and flailing motions about the head are not typical of epileptic seizures.  (Gilreath Depo., 67:12-22).

49.     Gilreath testified that the flailing often occurs with psychosomatic events.  (Gilreath Depo., 67:23; 68:21-22).

50.     Dr. Gilreath testified that Cooper's description of her seizures and the after effects of her seizures were not consistent with epileptic seizures.  He also testified that Cooper's claim that stress aggravated her seizures was not consistent with true seizures, but was consistent with pseudo seizures.  Dr. Gilreath testified that "stress causes pseudo seizures or psychogenic non-epileptic spells.  (Gilreath Depo., 69:13-23; 70:1-16).

51.     Dr. Gilreath testified that Cooper stated on October 28, 2014 she had been experiencing a seizure occurring every other day lasting a couple of minutes and quite severe since her last visit on October 17, 2014.  (Gilreath Depo., 71:1-6).

52.     Dr. Gilreath noted that Cooper was not responding to anti-epileptic seizure medication and that this was another indication to him that she was not

suffering epileptic seizures, but rather, was suffering psychogenic non-epileptic pseudo seizures or spells as he termed them.  (Gilreath Depo., 71:16-23; 72:1-7).

53.    Dr. Gilreath treated Cooper with an antidepressant as a result of his findings.  (Gilreath Depo., 73:18-23; 74:1-3).

54.    Dr. Gilreath's assessment was that he was 99% certain that Cooper's "seizures" were psychogenic spells and were not epileptic seizures.   (Gilreath Depo., 75:6-23; 76:1-21).

55.    Dr. Gilreath stated that the PNES or pseudo seizures complained of by Cooper in his opinion were not real seizures.  Dr. Gilreath further stated that it was "very possible that it was an act of malingering" or "it was a subconscious decision on the patient to have these spells either out of stress or because it's some kind of release for her, ok, much like – well, let me say this, it's either a malingering type thing or it's either a subconscious type thing. In that case, we would call it a conversion disorder." (Gilreath Depo., 77:16-23; 78:1-6).

56.    Dr. Gilreath referred Cooper for a psychiatric evaluation.  (Gilreath Depo., 79:3-7).

57.    Dr. Gilreath prescribed Cooper Zoloft as an antidepressant to treat her anxiety.  (Gilreath Depo., 84:21-23; 85:1-10).

58.    Dr. Gilreath noted from Cooper's pharmacy records that she was on a number of high risk prescription medications and that it concerned him the amount

of medication that was being prescribed to Cooper going back to 2010 through 2014. (Gilreath Depo., 90:12-23; 91:1-23; 92:1-21).

59.     Dr. Gilreath testified the following concerning Cooper's ability to perform the duties of a 911 dispatcher based on his review of her medical records and treatment of her in October, 2014:

> "Q.    Would in your judgment and opinion –
> A.    Okay
> Q.    – with a reasonable degree of medical probability this lady be somebody who based on what you have seen here, based on that evidence, based on your having treated her, that could or should be answering a phone in a 911 office and dispatching first responders and guiding those first responders to medical and other emergencies?
>                  . . .
> A.    I would feel very uncomfortable [objection interposed by Cooper's counsel].
> A.    I would feel very uncomfortable having this individual performing those job duties."

(Gilreath Depo., 94:11-23; 95:1-7).

60.     Dana Cooper's seizures involve violent shaking in which her eyes roll back. The seizures last about 30 seconds and she is unresponsive from 30 seconds to a one minute afterward. (Keith Cooper Depo., 11:23; 12:1-4).

61.     When Dana Cooper first began having seizures in August of 2013 or 2014, according to Keith Cooper, she would have four to six seizures every day, except on "good days" she would only have one or two seizures. (Id. 12:5-13).

62.     Cooper sometimes would have two or three seizures at night between 6:00 and 9:00 p.m.  (Id. 13:4-7).

63.     Dana Cooper would have seizures at night in which she tensed up and made a loud sound as if she were shouting through her teeth and began shaking violently. (Id.  13:14-21).

64.     During her seizures, Cooper will shake violently the entire time. (Id. 14:6-7).

65.     When Dana Cooper has a seizure, her husband would lay her down or sit her up and keep talking to her until she could realize where she was. Sometimes that was fairly quickly and sometimes it took the rest of the day. If it was one of Cooper's more violent seizures, Keith Cooper would have to help her back and forth to the bathroom and other personal care activity the rest of the day. (Id. 14:21-23; 15:1-9).

66.     Dana Cooper was still having seizures until May, 2017. She then began taking medication that cut down on the seizures drastically. (Id. 15:15-19).

67.     In May, 2017 Cooper went from having four to six seizures a day to having one or two a day and some days not having any seizures. (Id. 15:20-22).

68.     Cooper would have more violent seizures in which she bled from her mouth and shook more violently and lose the ability to take care of herself due to weakness and not realizing what year it was. Cooper began having seizures she

would have at least two of these violent seizures every day and sometimes more. (Id. 17:16-23; 18:1-10).

69.   Sometimes Dana Cooper would have one or two of the more violent seizures a day and sometimes one or two a week from 2013 or 2014 through the end of 2015.  (Id. 19:1-13).

70.   Keith Cooper last witnessed Dana Cooper having a serious, violent seizure in April, 2017.  (Id. 19:18-21).

71.   With the more violent seizures, Keith Cooper observed Dana Cooper shaking more violently, breaking a tooth with blood coming from her gums, foaming of the mouth and after the seizure he would have to help her back and forth to the bathroom, to bed, and to get dressed for the rest of the day.  Cooper would be unable to do anything the rest of the day except sit on the couch or lie down.  (Id. 20:6-23).

72.   Keith Cooper observed that squealing of a microphone or watching television, the squealing of brakes or other sounds would seem to trigger Dana Cooper's seizures.  (Id. 22:5-9).

73.   Dana Cooper worked at Lowe's Hardware Store doing stocking and pricing after being terminated by Walker County E-911.  She could not continue working at Lowe's due to having seizures.  (Id. 27:9-14).

74.    After resigning from Lowe's due to seizures, Dana Cooper tried to work for the Walker County Jail.  Keith Cooper had to go get Dana Cooper at Walker County Jail because she was having a seizure and he testified that she was forced to resign from the Walker County Jail because she was putting herself and other guards in an unsafe situation due to her seizures.  (Id. 28:6-23; 29:1-8).

75.    Cooper next attempted to work as a clerk at Piggly Wiggly grocery store.  Keith Cooper had to go get Dana Cooper on a number of occasions at Piggly Wiggly because she was having seizures.  (Id. 29:9-16).

76.    A manager at Piggly Wiggly told Keith Cooper that he was worried about Cooper falling and hurting herself in a seizure and Cooper resigned from Piggly Wiggly due to seizures.  Keith Cooper had to go get Dana Cooper at work at Piggly Wiggly about five times because she was having seizures.  (Id. 31-32).

77.    After Piggly Wiggly, Dana Cooper tried to work at Scott's Texaco service station as a clerk but was unable to do so because of having seizures at work.  (Id. 33).

78.    Keith Cooper had to go get Dana Cooper at work two or three times while she worked for Scott's Texaco because she was having a seizure.  (Id., 33:1-23; 34:22, 23; 35:21-23; 36:1-3; 36:18-23).

79.    Keith Cooper observed Dana Cooper attempt suicide around May 20, 2017, one day after her daughter refused to speak to her at her high school

graduation.   Keith Cooper observed blood on Dana Cooper's wrists and empty medicine bottles in the night stand beside her bed and razor blades beside Cooper. Keith Cooper called E-911 and she was taken by ambulance to the hospital in Jasper and spent several days in the psychiatric ward.  (Id. 37:11-12; 38:1-19; 39:4-23 39:4-23).

## II. <u>STANDARD OF REVIEW</u>

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).   The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Id</u>. at 323.  The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  <u>Id</u>. at 322-23.

Once the moving party has met its burden, Rule 56(c) "requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. To avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). Moreover, "the nonmoving party cannot create a genuine issue of material fact through speculation, conjecture, or evidence that is 'merely colorable' or 'not significantly probative.'" Vega v. Invsco Group, Ltd., 432 F. App'x 867, 869-70 (11th Cir.2011).

## III. <u>LEGAL ARGUMENT</u>

## A.    INTRODUCTION

Walker County E-911 is an Emergency Communications District, formed pursuant to § 11-98-1 et. seq. Ala. Code 1975, which is governed by a seven member Board of Directors who are appointed by the Walker County Commission. The day-to-day business of Walker County E-911 is conducted by the Director who is hired by the Board. The Plaintiff, Dana Cooper, was an E-911 Emergency Dispatcher who was hired by Director Roger Wilson in 2009. Mr. Wilson, in consultation with the Administration Assistant, Rhonda Walden, was the decision-

maker in Cooper's termination on October 1, 2014.  Mr. Wilson died unexpectedly on July 25, 2017, and the Board appointed Rhonda Walden as Interim Director thereafter.  (Walden Decl., ¶3).

Cooper's termination was based on job performance issues and on a confrontation she had with her direct supervisor on September 30, 2014 in the presence of other 911 dispatchers who were attempting to handle multiple emergency calls involving a serious multiple vehicle accident.  Wilson and Walden considered Cooper's job performance and her actions on September 30 which showed deliberate insubordination towards her supervisor and the Director and disregard for Walker County E-911's policies, and determined that she should be terminated.  (Id., ¶10).

On October 1, 2014 Ms. Walden and Roger Wilson met and reviewed written statements of Cooper's Direct Supervisor Sherrea Chamness and of co-employees, along with disciplinary warnings given to Cooper by her direct supervisor prior to making the decision to terminate Cooper's employment.   The decision to terminate Cooper was made on October 1 and Cooper was informed on October 2, 2014.   While Walden was not the final decision-maker, she was consulted by and agreed with Wilson's decision to terminate Cooper.  (Id., ¶9).

Cooper had requested and was granted FMLA leave from August 26, 2014 through September 10, 2014.  (Id., ¶12-14).  Cooper returned to work at her

request on September 11, 2014 and provided Walker County E-911 with a doctor's note releasing her to work with no medical restrictions.  (Id., ¶14).  She worked without any medical complaints or requests for time off or other accommodation from September 11 through September 29, 2014.  (Id., ¶15).  The confrontation with Cooper's supervisor on September 30 occurred when Cooper asked to leave early and was told that she could leave but that Walker County E-911 policy required her to have a doctor's excuse upon her return.  Cooper was never denied FMLA leave or any other requested accommodation prior to her termination.   (Id., ¶16).

Although she never had seizures at work, Cooper claims that in April, 2014 she began experiencing multiple random and sometimes violent seizures. (Cooper Depo., 72:12-16).  Cooper never requested an accommodation for seizures and her EEOC Charge makes no mention of seizures. Cooper is barred from asserting an ADA claim based on seizures for failure to exhaust her administration remedies.  *Duble v. Fed Ex Ground Package System, Inc.,* 572 Fed. Appx. 889 (11th Cir. 2014).  Based on Cooper's testimony, the testimony of her husband at the time, and the testimony of her treating neurologist, Cooper's violent and random non-epileptic pseudoseizures rendered her unable to perform the essential functions of a 911 dispatcher or to hold down any other job with or without any reasonable accommodation until May, 2017 at the earliest. (Cooper Depo, 72:21-23; 73:1-3)

21

(Gilreath Depo., 94: 11-23; 951-7) (Keith Cooper Depo., 20:6-23; 27:9-19; 28:6-23; 31-32).

## B. COOPER CANNOT ESTABLISH THAT SHE MEETS THE STATUTORY DEFINITION OF DISABLED.

To establish a prima facie case of discrimination under the ADA, the Plaintiff must show that "he had a disability, he was a qualified individual, and he was subjected to unlawful discrimination because of his disability." *Mazzeo v. Color Resolution Int'l, LLC*, 746 F.3d 1264, 1268 (11th Cir. 2014). Regardless of whether Cooper is alleging she is actually disabled or perceived to be disabled, to prevail on her ADA claim, she must demonstrate that she is a qualified individual under the ADA. *Bagwell v. Morgan Cnty. Comm'n*, 676 FedAppx. 863, 868 (11th Cir. 2017); see also *Wetherbee v. S. Co.*, 423 Fed.Appx. 933, 934 (11th Cir. 2011).

To be "qualified" under the ADA, an individual must be able to perform the "essential functions" of her job with or without reasonable accommodation. 42 U.S.C. § 12111(8). Cooper cannot present evidence that she was a "qualified individual" capable of performing the job duties of a 911 dispatcher. Whether a particular job function is essential is evaluated "on a case-by-case basis by examining a number of factors." *Samson v. Fed. Exp. Corp.*, 746 F.3d 1196, 1200-01 (11th Cir. 2014) (citing *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1230 (11th Cir. 2005)). The employer's judgment as to what functions of a job are

essential is entitled to "substantial weight" in the analysis, as is any written job description. *Id*. at 1201.

According to Rhonda Walden, the Interim Director of Walker County E-911, the essential functions of a Walker County E-911 Dispatcher include answering emergency 911 calls, contacting and dispatching emergency first responders and guiding those first responders to medical and other emergencies. (Walden Decl., ¶5). Dr. Gilreath, Cooper's treating neurologist whom she saw on October 17 and 28, 2014, shortly after her termination on October 2, 2014, testified that, based on his review of Cooper's medical history, prescription drug use and his treatment of her "I would feel very uncomfortable having this individual performing those job duties." (Gilreath Depo., 90:1-14; 95:1-7). Cooper herself testified that she had had numerous seizures from August, 2014, through October 2, 2014, in which she would lose consciousness without warning and shake violently and uncontrollably, and that it would take her some time to recover for these seizures. Cooper testified that since October 2, 2014, she has had literally **multiple hundreds** of such seizures, and that they occur without warning. (Cooper Depo., 197:17-23; 198:1).

Since her termination by Walker County E-911, Cooper's seizures have forced her to resign as a clerk at Lowe's, a jailer at the Walker County Jail, a grocery store clerk at Piggly Wiggly and as a clerk at a local gas station.

According to plaintiff's ex-husband Keith Cooper, her employers expressed concerns that she was endangering her own safety and the safety of others due to her seizures at work and asked her to resign.  (Keith Cooper Depo., 28:6-23; 29:1-8; 29:9-16; 33:1-13; 36:1-3).  There is a total lack of evidence that Cooper was capable, with or without reasonable accommodation, to perform the job duties of a 911 emergency Dispatcher in October, 2014 or for years thereafter.  Keith Cooper testified that Cooper's seizures continued to be numerous and did not begin to get any better until May, 2017.

## C.   ASSUMING THAT COOPER MET THE STATUTORY DEFINITION OF DISABLED, THERE IS NO EVIDENCE TO SUPPORT HER ADA FAILURE TO ACCOMMODATE CLAIM.

"Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability.'" _Terrell v. USAir_, 132 F.3d 621, 624 (11th Cir. 1998) (citing 42 U.S.C. ¶ 12112(b)(5)(A)).  A plaintiff claiming ADA-based disability discrimination under a failure to accommodate theory must Show that (1) he has a disability, (2) he is a qualified individual," (3) he identified for the defendant a reasonable accommodation, and (4) he was unlawfully discriminated against because of his disability.  _Willis v. Conopco, Inc._, 108 F.3d 282, 83, 286 (11th Cir. 1997) (per curiam) (holding that the plaintiff must identify an available accommodation to establish a _prima facie_ case on a failure to accommodate claim

under ADA); _Schwertfater v. City of Boynton Beach_, 42 F. Supp. 2d 1347, 1357 (SD. Fla. 1999) (listing _prima facie_ elements as including requirement that plaintiff identified a reasonable accommodation for the defendant).  "[T]he burden of identifying an accommodation that would allow a qualified individual to perform the job rests with that individual, as does the ultimate burden of persuasion with respect to demonstrating that such an accommodation is reasonable."  _Stewart v. Happy Herman's Cheshire Bridge, Inc._, 117 F.3d 1278, 1286 (11th Cir. 1997).

The only "accommodation" Cooper claims she requested was additional time off on October 2, 2014 after the decision to terminate her employment had been made on October 1, 2014.  Even assuming Cooper could perform the essential duties of her Dispatcher job in May, 2017 (for which there is no evidence), time off from October, 2014 to May, 2017 is not a reasonable accommodation required of Walker County E-911.   See _Lucas v. W.W. Grainger, Inc._, 257 F.3d (An accommodation is "reasonable" and necessary under the ADA only if it enables the employee to perform the essential functions of the job).

Even if Cooper could establish a prima facie case under her ADA failure to accommodate claim, Walker County E-911 has articulated non-discriminating reasons for her termination and there is no evidence that these reasons are a pretext for ADA or FMLA discrimination.  The basis for Cooper's termination are set out in detail in Section E, _infra_.

**D.    THERE IS NO EVIDENCE TO SUPPORT PLAINTIFF'S FMLA INTERFERENCE CLAIM.**

To prevail on an FMLA interference claim, plaintiff must show that:

(1)  she was an eligible employee
(2)  the employer was required to provide FMLA benefits
(3)  the employee was "entitled" to FMLA leave
(4)  the employee notified the employer of her need to take FMLA leave
(5)  the employer denied the employee benefits she was entitled to pursuant to the FMLA.

_Rudy v. Walter Coke, Inc._, 21 F.Supp.3d 1228, 1238 (N.D. Ala. 2014).

An employee's rights are limited by statutory directive in that an employee is not entitled "to a right, benefit, or position to which the employee would not have been entitled had the employee not taken leave.  29 U.S.C.A. § 2614(a)(3)(B) ("Nothing in this section shall be construed to entitle any restored employee…any right, benefit, or position of employment other than any right, benefit, or position to which the employee would have been entitled had the employee not taken the leave."); 29 C.F.R. § 825216(a)(1)) ("An employee has no greater right to reinstatement or to other benefits and conditions of employment than if the employee had been continuously employed during the FMLA leave period."); _Strickland v. "Water Works & Sewer Bd.,_ 239 F.3d 1199, 1208 (11th Cir. 2001) ("[I]f an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable.").

26

The FMLA makes it illegal "for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. 29 U.S.C. § 2615(a)(1). "A Plaintiff claiming interference must demonstrate by a preponderance of the evidence that she was denied a benefit to which she was entitled." _Harley v. Health Ctr. of Coconut Creek_, 487 F.Supp.2d 1344, S.D.Fla. 2006) (citation omitted).

It is undisputed that Cooper requested and was granted FMLA leave from August 26 through September 10, 2014. It is also undisputed that Cooper voluntarily came back to work on September 11, 2014 and provided Walker County E-911 with her doctor's note releasing her to work with no medical restrictions. (Walden Decl, ¶13, 14). Also undisputed is the fact that Director Wilson and Rhonda Walden met on October 1, 2014 following an incident on September 30, 2014, and reviewed Cooper's performance and the September 30, 2014 incident in which Cooper argued openly with her Direct Supervisor and disturbed other 911 dispatchers who were attempting to take several critical 911 calls. (Id., ¶10). It is further undisputed that Wilson made the decision to terminate Cooper on October 1, 2014 after meeting with Walden and that Walden agreed with that decision on that date.  (Id.)

Cooper received a call from Wilson on October 1, 2014 asking her to come into his office on October 2, 2014, when she was not scheduled to work. Cooper

suspected that she was being terminated and early in the morning on October 2, 2014, went by her doctor's office and obtained a doctor's note. (Cooper Depo., 129:11, 15-23; 130:1-17; 16:16-21). Cooper then brought that doctor's note with her to the meeting with Wilson and Walden at Walker County E-911. It is undisputed that the decision to terminate Cooper had already been made before she obtained and presented Wilson and Walden with her doctor's note and asked for additional time off, and that her termination was completely unrelated to her new request for time off *which plaintiff obtained only because she suspected she was going to be terminated.*

**E.     COOPER'S FMLA RETALIATION CLAIM FAILS AS A MATTER OF LAW BECAUSE THERE IS NO EVIDENCE THAT WALKER COUNTY E-911'S NON-DISCRIMINATORY REASONS FOR HER TERMINATION ARE A PRETEXT FOR DISCRIMINATION.**

"To state a claim for retaliation under the FMLA, the employee must prove, by a preponderance of the evidence, that: (1) he is entitled to the claimed benefit, (2) he suffered an adverse employment action; and (3) the adverse action was "intentional" and "motivated" by his participation in the protected activity, establishing a causal connection." *Bentley v. Orange Cnty., Fla.*, 445 Fed.Appx. 306, 309(11th Cir. 2011); *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286, 1297 (11th Cir. 2006). To establish a prima facie case of FMLA retaliation, "the plaintiff must show that (1) she engaged in statutorily protected conduct; (2) she experienced an adverse employment action; and (3) there is a causal

connection between the protected activity and the adverse employment action."
_Gilliard v. Ga. Dep't of Corrs_., 500 Fed.Appx. 860, 864 (11th Cir. 2012).  "If the
plaintiff establishes a prima facie case, the burden then shifts to the defendant to
articulate a legitimate reason for the adverse action."   Id.   "If the defendant
provides such a reason, the plaintiff must then show that the defendant's proffered
reason for the adverse action is pretextual."   Id.   "Pretext means that the reason
given by the employer was not the real reason for the adverse employment
decision."  Id.  at 864-65.  The plaintiff "must meet [the proffered] reason head on
and rebut it, and the employee cannot succeed by simply quarreling with the
wisdom of that reason."   Id.   (quoting "_Chapman v. Al Transp._, 229 F.3d 1012,
1030 (11th Cir. 2000)).

Dana Cooper was employed as a 911 Dispatcher on the night shift from
2009 until August, 2014.  On August 12, 2014, Cooper was transferred from night
shift, which is from 7:00 p.m. to 7:00 a.m., to day shift in order to give her
additional training in 911 call-taking.   The day shift has a much heavier call
volume than night shift.   On August 14, 2014, Cooper's day shift supervisor,
Sherrea Chamness, issued a verbal warning to Cooper and another dispatcher for
failure to handle a call correctly.   (Walden Decl., ¶6, Exh. B).

Cooper requested and was granted FMLA leave from August 26 to
September 10, 2014.   She returned to work without restrictions voluntarily on

September 11, 2014.   On September 22, 2014, Chamness gave Cooper a Final Written Warning for excessive personal telephone use while on 911 duty. (Walden Decl., ¶7).

On September 29, 2014, Walden met with Dana Cooper and Sherrea Chamness again when Cooper was given a First Written Warning for incorrectly logging a 911 call due to not listening to the caller.   This was a First Written Warning that followed a verbal warning Cooper was given on August 5, 2014 for not listening to the caller and incorrectly logging information.   (Walden Decl., ¶8, Exh. D).

On September 30, 2014 Cooper asked Chamness to leave work early for medical reasons.   Chamness told her that Walker County E-911 policy required a doctor's excuse upon her return, since she was scheduled to be off the following two shifts.   Cooper began arguing with Chamness in the 911 dispatch room and adjacent kitchen area, calling the policy "ridiculous" repeatedly and saying that everything was at the Director's discretion.   Cooper continued to argue with Chamness while other 911 dispatchers were attempting to handle 911 calls involving a serious multiple vehicle accident and interfered with their ability to handle these calls.   (Walden Decl., ¶9, Exh. E, F, D, H).

Wilson and Walden met on October 1, 2014 and discussed whether a disciplinary action should be taken concerning Cooper, and if so, what disciplinary

action was appropriate.   After reviewing the written statements of the Dispatchers and Shift Supervisor on duty on September 30, 2014, the disciplinary warning notices for Cooper dated September 22 and September 29, 2014, the video of the September 30 incident and Walker County E-911 policy, Director Roger Wilson made the decision on October 1, 2014 to terminate Dana Cooper and Walden agreed with that decision.   (Id., ¶9).   Walden agreed with the Director's decision based in part on Dana Cooper's 911 dispatcher performance in failing to take calls correctly.   She also relied on Ms. Cooper's deliberate acts of insubordination toward her supervisor, Sherrea Chamness, in arguing with her openly about Walker County E-911 leave policy in the 911 dispatch room which disturbed other 911 dispatchers handling a serious emergency situation.   (Id.m ¶10).

The law is clear that a court is not to second-guess business decisions or to act as a super-personnel department. See, *E.E.O.C. v. Total System Services, Inc.*, 221 F.3d 1171, 1176 (11th Cir. 2000). The relevant question is whether the plaintiff has adequately demonstrated the proffered reason for the termination is pretextual. Id.  Cooper can offer no evidence to meet her burden to demonstrate that the decision to terminate her was motivated by unlawful discriminatory animus. Id. (citing *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1361 (11th Cir. 1999)).

**F.    PLAINTIFF'S 42 U.S.C. 1983 AND STATE LAW DUE PROCESS CLAIMS FAIL BECAUSE COOPER WAS AN "AT WILL"**

**EMPLOYEE AND AS SUCH HAD NO PROTECTED PROPERTY INTEREST IN CONTINUED EMPLOYMENT.**

Cooper's procedural due process claims related to her termination require a showing that she had a protected property interest in her continued employment. S*ee Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 571, 92 S.Ct 2701, 33 L.Ed.2d 548 (1972).  The Supreme Court has explained:

> 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire' and more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it.' [*Roth*, 408 U.S. at 577, 92 S.Ct. 2701].  Such entitlements are, "'of course, …not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law."'  *Paul v. Davis*, 424 U.S. 693, 709, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) (quoting *Roth, supra*, at 577, 92 S.Ct. 2701); *see also Phillips v. Washington Legal *1139 Foundation*, 524 U.S. 156, 164, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998).
>
> *Town of Castle Rock, Colo v. Gonzales,* 545 U.S. 748, 756, 125 S.Ct 2796, 162 L.Ed.2d 658 (2005).

The plaintiff must point to some state statute, regulation, ordinance, express or implied contract, or some other mutually explicit understanding that establishes that the claimed benefit cannot be withdrawn except for "cause."  *See Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012); *see also Ross v. Clayton County, Ga.*, 173 F.3d 1305, 1307 (11th Cir. 1999) ("Generally, a public employee has a property interest in continued employment if state law or local ordinance in any way limits the power of the appointing body to dismiss an employee."  (internal

quotation marks omitted)); *Nicholson v. Gant,* 816 F.2d 591, 597 (11th Cir. 1987).

In Alabama, employment is generally at will and thus terminable by either party with or without cause. *Harper v. Winston County*, 892 So.2d 346, 351 (Ala.2004); *Mack v. Arnold*, 929 So.2d 480, 483-84 (Ala.Civ.App.2005). No property interest attaches in such an arrangement. *Brett v. Jefferson County, Ga.*, 123 F.3d 1429, 1434 (11th Cir. 1997); *Stough v. Gallagher*, 967 F.2d 1523, 1530 (11th Cir. 1992). Cooper's signed employment application clearly states that she is applying for a position for which she can be terminated for any reason. (Walden Decl., ¶4, Exh. A). As an "at will" employee, Cooper has no protectable property interest that can support her due process claims under federal or state law.

### G.   WALKER COUNTY E-911 IS A STATE AGENCY ENTITLED TO ELEVENTH AMENDMENT IMMUNITY.

Walker County E-911 is an Emergency Communications District formed pursuant to the Emergency Telephone Service Act ("et seq., § 11-98-1, et seq., Ala. Code 1975. As such, Walker County E-911 is a political and legal subdivision of the State of Alabama.") § 11-98-2, Ala. Code 1975. *Century Tel of Alabama, LLC v. Dothan/Houston County Communications District*, 179 So.3d 456, 458 (Ala. 2015). As a political and legal subdivision of the State of Alabama, Walker County E-911 is entitled to 11th Amendment immunity against claims for money damages. *Ross v. Jefferson County Dept. of Health*, 701 F.3d 655, 660 (11th Cir. 2012).

The Eleventh Circuit requires courts to analyzes the following four factors to determine whether a party, like Defendant, acted as an arm of the state in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity.  See *Miccosukee Tribe of Indians of Fla. V. Fla. State Athletic Comm.*, 226 F.3d 1226, 1231-34 (11th Cir. 2000); *Shands*, 208 F.3d at 1311; *Tuveson v. Fla. Governor's Council on Indian Affairs, Inc.*, 734 F.2d 730, 732 (11th Cir. 1984).

In 2012, the Alabama State Legislature created a statewide 911 Board and 911 fund.  § 11-8-4.1 and § 11-98-5.2, Ala. Code 1975, respectively.  As part of the 2012 amendments, the legislature substantially amended § 11-98-5 to provide for a "single, monthly statewide 911 charge … on each active voice communications service connection [wireline and mobile telephones] in Alabama that is technically capable of accessing a 911 system."  § 11-98-5(a), Ala.Code 1975.  The telephone-service providers are required to collect the 911 charges from the telephone-service subscribers on a monthly basis and then to remit the 911 charges collected to the State 911 Board.  § 11-98-5(a) and (b), Ala.Code 1975. The 911 charges are then deposited in the 911 fund for subsequent distribution to the emergency-communications districts.  § 11-98-5.2(b)(1).  Ala.Code 1975.

Walker County E-911 receives all of its funding from the State of Alabama

911 Board and is a political and legal subdivisions of the State of Alabama pursuant to the ETSA.  As a state agency which receives all of its funds from the State of Alabama, Walker County E-911 is entitled to 11th Amendment immunity against damages claims.  Plaintiff's claims under the FMLA which are related to her own medical condition, are subject to 11th Amendment immunity, as are Plaintiff's claims under the ADA.  (Walden Decl., ¶2).

Congress has not abrogated Eleventh Amendment immunity from FMLA self-care claims, *Coleman v. Court of Appeals of Maryland*, 556 U.S. 30 (2012), nor has Eleventh Amendment immunity been abrogated for ADA employment claims.  *Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 368 (2001).

## IV. CONCLUSION

Based on the foregoing, Defendant Walker County E-911 requests that the Court grant judgment as a matter of law in Defendant's favor on all claims asserted by the Plaintiff in this action.

Respectfully submitted,

**s/ James Michael Cooper**
JAMES MICHAEL COOPER
(ASB-6353-P79J; COOPJ6353)
Attorney for *Walker County E-911*
Porterfield, Harper, Mills, Motlow
& Ireland, PA

35

22 Inverness Center Parkway, Suite 600
Birmingham, Alabama 35242
Telephone: 205.980.5000
Facsimile: 205.980.5001
Email: jmc@phm-law.com

**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ALABAMA
JASPER DIVISION**

| | | |
|---|---|---|
| **DANA COOPER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO:** |
| | ) | **6:16-CV-01746-TMP** |
| **WALKER COUNTY E-911,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on December 15, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Charles C. Tatum, Jr.
Post Office Box 349
Jasper, Alabama 35502
Telephone: 205-387-0708
E-mail: ctatum7@aol.com


*s/ James Michael Cooper*
OF COUNSEL

37