## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## JASPER DIVISION

| | | |
|---|---|---|
| DANA COOPER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.   6:16-cv-1746-TMP |
| | ) | |
| WALKER COUNTY E-911, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on cross motions for summary judgment. Defendant Walker County E-911 filed a motion (doc. 23), supported by evidence (docs. 24, 30), seeking adjudication of all of the plaintiff's claims.   Plaintiff Dana Cooper filed a response in opposition, supported by evidence.   (Doc. 35). Defendant filed a reply brief.   (Doc. 41).   Also at issue is the plaintiff's motion to strike portions of Rhonda Walden's declaration (doc. 32) and her motion to strike the opinion testimony of Dr. Gilreath (doc. 33).   The defendant has responded to the motions to strike.   (Docs. 39, 40). The plaintiff filed a motion for partial summary judgment, seeking summary adjudication of her claims that she was denied due process under both the Alabama and United States Constitutions.   (Doc. 31).   The defendant filed a response in opposition, supported by evidence.   (Docs. 37, 38).

In addition, the defendant has moved to strike portions of the reply brief filed by plaintiff in support of her motion for partial summary judgment. (Doc. 42). All matters have been fully briefed. The parties have consented to the exercise of jurisdiction by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c).

## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex,

477 U.S. at 322-23.  There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions of file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)).  The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings.  Celotex, 477 U.S. at 324.  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.


After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The substantive law will identify which facts are material and which are

irrelevant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Id. at 248.  "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  Id. at 249.  His guide is the same standard necessary to direct a verdict:  "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983).  However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.  Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989).  Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff.  Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988).  Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function

of the jury, and therefore the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor.   Anderson, 477 U.S. at 255.   The non-movant need not be given the benefit of every inference but only of every reasonable inference.   Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.   FACTS

Viewing the evidence provided by both parties in the light most favorable to the nonmoving plaintiff, the following facts are considered true for purposes of the defendant's motion for summary judgment.[1]

Walker County E-911 is an emergency communications district formed in accordance with the Emergency Telephone Service Act, Alabama Code § 11-98-1, *et seq*.   It is governed by a seven-member board of directors.   Walker County E-911 receives all of its funding from the Alabama 911 Board, which is funded by a charge levied on telecommunications bills.

---

[1]     In Section IV, *infra*, the court will evaluate the plaintiff's motion for summary judgment on her due process claims.   In adjudicating the plaintiff's motion, the facts will be viewed in the light most favorable to the nonmoving defendant.

Dana Cooper applied for a job as a 911 emergency dispatcher with Walker County E-911 on August 17, 2009. She filled out an application form in which she agreed to conform to Walker County E-911's rules and regulations. Immediately above her signature on the application appeared the following:

> In consideration of my employment, I agree to conform to the company's rules and regulations, and I agree that my employment and compensation can be terminated, with or without cause, and with or without notice, at any time, at either my or the company's option. I also understand and agree that the terms and conditions of my employment may be changed, with or without cause, and with or without notice, at any time by the company. I understand that no company representative, other than it's [sic] president, and then only when in writing and signed by the president, has the authority to enter into any agreement for employment for any specific period of time, or to make any agreement contrary to the foregoing.

(Doc. 30-2, p. 2).[2] Cooper asserts that when she applied for the job Wilson told her that, once she completed a 90-day probationary period, she could be fired only for cause. (Cooper affi., doc. 31-4, para. 6). Consistent with this assertion, Tim Stockman, the chairman of the board of directors of Walker County E-911, stated

---

[2] It is not clear to the court from the evidence submitted who the "president" referred to in the application may have been. The evidence and testimony indicates that supervision of the 911 dispatchers was most immediately by a rotation supervisor (in this instance Sherrea Chamness). Moving up the chain of command was an administration assistant (at the time Rhonda Walden), who in turn worked under the direction of the executive director (at the time Roger Wilson), also referred to as the CEO, who answered to a board of directors. It was Wilson who exercised the hiring and firing authority and who was in charge of the Walker County E-911's day-to-day operations, and defendants have argued that Wilson was the "president."

that it would violate Walker County E-911's policy to fire an employee without cause.   (Stockman depo., doc. 31-8, p. 59).

Terms of Cooper's employment also were defined by an employee handbook. Walker County E-911 provided a copy that was signed and dated by the plaintiff on August 8, 2014, and includes the following provisions relevant to this action:

### VI.   EMPLOYMENT POLICIES

#### A.   Full Time Employees

All employees hired as full-time will work under the supervision of Rotation Supervisors.   Full time employees do not have a probationary period.   Very simply, as long as the employee performs up to their job classification, they have a job.   Exceptions would be for disciplinary reasons or budget restraints.[3]

* * *

### XII.   GENERAL CONDUCT

* * *

#### B.   CAUSES FOR DISCIPLINARY ACTION

The following activities are cause for disciplinary action but this list is not all inclusive.   Employees are expected

---

[3]     It is interesting to note that this provision of the handbook contains the notation: "(Revised 08/08/2014)," which is the date the copy of the handbook offered into evidence was signed by the plaintiff, who affirmed that she had read the handbook and "agree[d] to abide by the policies and procedures contained therein."   (Exh. 9 to Cooper depo., doc. 30-34, p. 1).

to use reasonable judgement in carrying out their duties and not act in a manner contrary to the best interests of Walker County 9-1-1.

* * *

26.   Insubordination

* * *

## XIV.   DISCIPLINARY PROCEDURES

Discipline is necessary to the efficient operation of any organization.   These procedures are used to correct behavior and actions that are not productive to the goals of Walker County E9-1-1.

### A.   VERBAL REPRIMANDS

* * *

### B.   WRITTEN REPRIMANDS

* * *

### C.   SUSPENSION WITHOUT PAY

* * *

### D.   SUSPENSION WITH PAY

* * *

### E.   DEMOTIONS

* * *

### F.   DISMISSALS

1.  Dismissals are used for extreme neglect to duty, conduct unbecoming an employee of Walker County E9-1-1, or extreme or continued violation of rules.

## XV.  GRIEVANCE PROCEDURES

It is the policy of Walker County E9-1-1 to resolve grievances in a fair and equitable manner.  No employee will be penalized or retaliated against for filing a grievance.

### A. PURPOSE

1.  The grievance procedure is to permit eligible employees equal access to those individuals who make decisions concerning personnel matters, and to provide a standard process for the prompt investigation and resolution of employees [sic] complaints.
2.  The grievance procedure will not be used to resolve differences among employees of similar rank or grade.

### B. DEFINITION

1.  A grievance is a statement of an employee that a supervisor or E9-1-1 official has improperly or prejudicially applied or failed to apply the personnel rules, regulations, or procedures of Walker County E9-1-1.

* * *

(Exh. 8 to Cooper depo., doc. 30-33, pp. 11-20).

The essential job duties of an emergency 911 dispatcher include answering emergency 911 calls, contacting and dispatching emergency first responders, and guiding those first responders to medical and other emergencies. Dana Cooper was employed as a full-time 911 dispatcher on the night shift from 2009 until August 2014. On August 5, 2014, Cooper was given a verbal warning for not listening to 911 callers and for incorrectly logging 911 information. (Doc. 30-5). There is no indication that she filed a grievance with respect to this verbal warning. On August 12, 2014, Cooper was transferred from night shift to day shift, along with other night shift workers, in order to gain additional training in taking 911 calls. The day shift has a much heavier call volume than the night shift, offering greater opportunities for training. On August 14, 2014, Cooper received a verbal warning[4] for failure to handle a call correctly.

On August 26, 2014, Cooper requested leave pursuant to the Family Medical Leave Act ("FMLA") because of an upper gastrointestinal condition that caused severe indigestion, belching, and vomiting. Cooper provided a report from Dr.

_____

[4] Defendant refers to the warning as a verbal warning given by her day shift supervisor, Sherrea Chamness, but the plaintiff asserts that the warning was a written warning issued by Scott Holderfield, Walker County E-911's operations assistant. The document to which the plaintiff refers, however, is dated August 14, 2010, more than four years before the warning noted by the defendant. (Doc. 30-3). It appears, therefore, that Cooper received an additional warning in 2010. There is no dispute, however, that Cooper was put on notice that her handling of a call on August 14, 2014, was improper. Because it appears that the plaintiff's reference is in error, and because there is no evidence that the warning was written, the court accepts the defendant's description of the warning as a verbal warning.

Anitra Batie indicating that Cooper would be unable to perform her job functions from August 26, 2014, until October 13, 2014. Cooper's FMLA leave request was granted on September 3, 2014. She did not work any shifts between the dates of August 26, 2014, and September 10, 2014. On September 10, 2014, Cooper provided a note from her doctor dated September 9, 2014, which stated;

> Dana Cooper is currently under my medical care. I am releasing her back to work full duty. She may return to work on 09/11/2014. Activity is restricted as follows: none. If you require additional information please contact our office.

(Doc. 31-5). Cooper returned to work on September 11, 2014, and apparently worked without incident until September 22, 2014.

On September 22, 2014, Cooper received a verbal warning from Roger Wilson, the E-911 director,[5] and a "final written warning" from her supervisor, Sherrea Chamness, for excessive use of her personal telephone while on duty. (Doc. 30-4). Cooper admits that the warning given for telephone use was a correct evaluation of her conduct. On September 29, 2014, Cooper received a "first written warning" related to logging calls incorrectly and not listening to callers.

---

[5]     Wilson is deceased and apparently no discovery was conducted prior to his death that would preserve any of his testimony.

(Doc. 30-5). She "took it as a learning tool" and did not think that she was being "picked on." (Cooper depo., doc. 30-25, pp. 161-63).

The next day, on September 30, 2014, Cooper became ill before the end of her shift. She experienced the same nausea and vomiting that had been the basis of her FMLA leave. She asked her supervisor, Chamness, if she could leave early. Chamness told her she could leave but a doctor's excuse would have to be provided upon her return because she was not scheduled to work for the following two days, October 1 and 2. Cooper questioned whether that was what the policy required, and Chamness called Wilson on the phone to confirm that a doctor's excuse would be required.[6] Chamness then made a photocopy of the policy language and gave Cooper the copy. For about 20 minutes, Cooper continued to make retching or belching sounds, and to come in and out of the dispatch room. After Chamness told her that she had to have a doctor's excuse, Cooper said, "fine." Cooper admits that she was "perturbed" when Chamness told her she had to bring in a doctor's excuse for leaving early on September 30, 2014. Cooper also said to Chamness that the

---

[6] The policy states: "If an employee calls in on a holiday, a day preceding a scheduled leave shift or scheduled shift off, a day following a scheduled leave shift or scheduled shift off, or on a day another employee is on scheduled leave, the Director may request a Doctors [sic] excuse of the employee." (Doc. 30-10, p. 1). Although the parties do not discuss this issue, it is unclear to the court whether this provision covered leaving early, as Cooper did, because it explicitly uses the term "calls in," indicating that the provision applies when an employee takes a full sick day prior to a scheduled day off, as opposed to working part of the day and leaving early.

policy was "ridiculous," and told Chamness that she was still on FMLA and so she should not be required to turn in a doctor's excuse.[7]

After Cooper left the building that day, the dispatchers discussed Cooper's illness and said that she should not have eaten chicken wings for lunch. One dispatcher stated that he did not want to work with her any longer. Chamness

---

[7] A copy of the surveillance recording from the dispatch room captured most of the events of that afternoon, but events that occurred in the adjacent kitchen or bathroom were not within range of the camera. The audio from that recording provides much of what was said, but some was not loud enough to be recorded, or was muffled, or occurred in the adjacent kitchen. The disc containing the video was filed conventionally by the plaintiff. (Doc. 35-3). The court's synopsis of what can be seen and heard on the disc is as follows: Cooper comes out of a door that apparently opens into a bathroom, approaches Chamness, and asks, "Can I please go?" Chamness asks why, and Cooper tells her it is because she is throwing up. Chamness says something about "those chicken wings," and Cooper goes back into another room for a few minutes, during which she can be heard gagging or belching. Chamness props the door to the room open. Chamness talks to Cooper, who is off-camera in the adjacent room, from inside the dispatch room. In response to something Cooper says that cannot be heard on the video, Chamness says, "You have to go today." Cooper replies, "Fine." Chamness then tells her that the handbook requires that, and Cooper replies, "No, it don't." Chamness retrieves a copy of the employee handbook and pages through it. She takes a page from the book to the copier and returns to the book. She then highlights a portion of the page she copied. Cooper, gagging loudly, takes her chair and rolls it into the other room. Chamness takes over Cooper's position answering 911 calls, while Cooper continues to make noises of being sick from the other room. Several minutes later, Cooper comes out of the off-camera room, and Chamness hands her a piece of paper, apparently the policy language. She and Chamness engage in a short discussion, which is not audible. Cooper leaves the dispatch room and goes into the adjacent room. The other 911 dispatchers begin handling numerous calls related to a head-on automobile collision, with the possibility of an air evacuation. Cooper continues to make gagging noises and then returns to the dispatch room. She tells Chamness that she was not arguing and that she would do what she had to do. Chamness gets onto the phone, apparently with Wilson, and Chamness tells Cooper to go to the doctor today. Cooper says her medicine is at home, and that she will go to the doctor after she quits throwing up. Cooper leaves the dispatch room for the adjacent, off-camera room, and Chamness follows her in. They continue the discussion. Their voices can be heard talking on the disc, but the conversation is neither loud nor discernible. Chamness returns to the dispatch room and tells one the other dispatchers to write a letter "for her." The dispatchers complain to Chamness that they could not hear the callers they were assisting during the Chamness's conversation with Cooper. At this point, the video ends.

instructed the employees to prepare written statements about the incident. The statements (doc. 30-6) were reviewed by Wilson and Rhonda Walden,[8] who was second-in-command as the administrator assistant, as part of the process of making a determination of what personnel action to take regarding Cooper. Walden reviewed the surveillance recording of the incident, but did not watch the portion of the recording that occurred after Cooper left for the day.

Walker County E-911 has applied the policy to require written doctor's excuses from other 911 dispatchers and from Walden when they have taken off for shifts prior to a scheduled shift off, but there is no evidence that it had been applied in the similar circumstance of an employee leaving work early.[9] The policy does not apply to an employee who is off because of leave provided under the FMLA.

On October 1, 2014, Wilson and Walden met to discuss possible disciplinary action concerning Cooper's conduct on September 30, 2014. They reviewed the statements written by the other dispatchers working that evening, the statement of Chamness, and the video taken in the dispatch room, along with the Warning

---

[8] The plaintiff objects to Walden's testimony as to what Wilson "reviewed," asserting that Walden is testifying as to Wilson's mental operations. Walden observed Wilson at the meeting, and while she may not testify as to what Wilson thought, there is no dispute that Wilson had available to him the statements, and that there is no evidence to indicate that he ignored the statements or refused to review them.

[9] To be clear there is no evidence either way. There is no evidence that other employees were ever allowed to leave early without being required to provide a doctor's excuse upon return to work later. There is no evidence of an employee leaving early in a circumstance similar to plaintiff's.

Notices dated September 22, 2014, and September 29, 2014, and the Standard Operating Procedures for Walker County E-911.[10]

Walden testified that Wilson made the decision to terminate Cooper, and the plaintiff does not seem to dispute this. Walden said that she agreed with Wilson's decision, in part because of Cooper's warnings regarding failure to take calls correctly and the use of her personal phone, but primarily because of Cooper's behavior on September 30, which was deemed to be insubordinate toward Chamness, her supervisor. Walden agreed that she could "barely hear" the discussions between Cooper and Chamness on the surveillance video. Cooper was not told that she had been insubordinate by Chamness by either Walden or Wilson, and Walker County E-911 did not state that insubordination was the reason for the firing until a year later when its attorney responded to Cooper's EEOC charge.

---

[10] Although the plaintiff objects paragraph 10 of Walden's declaration, referring to what Wilson, now deceased, "reviewed," Walden's testimony makes clear that Wilson had provided her with the materials listed and that she and Wilson had a meeting at which they discussed the above-described materials. Walden can testify that she witnessed Wilson handle the documents, discuss the surveillance video, and otherwise appear to "review" the materials. She can express the lay opinion, based on FRE 701(a), that he appeared familiar enough with the materials to give her the perception that he had reviewed them himself. While she cannot testify to what Wilson *thought* about the materials, she can testify that she witnessed him "review" them before making the decision to terminate the plaintiff's employment. The motion to strike (doc. 32) is DENIED.

Wilson called Cooper on October 1, 2014, and asked her to come in to meet with him at 10:00 a.m. on October 2, 2014.[11]  Cooper went to see Dr. Batie at 8:30 on the morning of October 2, 2014, to obtain a doctor's excuse for leaving early on September 30, 2014.  She met with Wilson and Walden in Wilson's office as scheduled, and she attempted to give Wilson her doctor's excuse, in which Dr. Batie indicated that Cooper was unable to work until October 21, 2014.[12]  Cooper was informed that her employment had been terminated.  She told Wilson that she had qualified for leave under the FMLA and was treated unfairly when Chamness told her that she had to bring in a doctor's excuse for leaving her shift early.   Wilson told Cooper that he did not need the doctor's excuse because she was fired.   He also told her that she was no longer on leave pursuant to the FMLA because her doctor had written a letter that stated she could return to work without restrictions on September 11, even though the FMLA leave approved previously by Walker County E-911 extended through October 13, 2014.   Cooper said Wilson told her that her doctor had "messed up" the paperwork by returning her to work.

---

[11]     Cooper was not scheduled to work on October 1 and October 2.

[12]     Cooper asserts that the doctor's excuse indicates a second request for FMLA leave. The note from Dr. Batie states only that the "patient is unable to work until 10/21/2014." (Doc. 35-2, p. 5).   The defendant, in its response to the EEOC charge, stated that Cooper "attempted to hand Mr. Wilson what she claimed to be a doctor's note for FMLA leave," and that Wilson said "that he did not need to see the doctor's note because he had already made the decision to terminate her. . . ."   (Exh. 3 to Stockman depo.,doc. 30-51, p. 4).

After Cooper was terminated, she submitted a document that she titled a "Grievance to Walker County E-911 and Roger Wilson" in which she requested a hearing before the board of directors. (Stockman depo., doc. 31-8, p. 44). Walker County E-911 determined that its policy for grievances applied only to employees and was not applicable to anyone no longer considered an employee. No hearing on the grievance was held. The chairman of the board of directors, Tim Stockman, testified that he did not remember any discussions regarding Cooper and stated that the board "refer[s] everything" regarding legal matters to the board's attorney and follows the attorney's advice. (Stockman depo., doc. 31-8, p. 62).

Cooper testified that, although it was her opinion that getting leave from work became more difficult after she got FMLA leave in August, it was always difficult for any employee of Walker County E-911 to obtain leave from work. Cooper also agreed that all dispatchers' calls are scrutinized carefully, that they are written up for doing things that are incorrect in taking a call, and that such scrutiny is part of being a 911 dispatcher. Cooper testified that she was treated differently than other employees after she returned to work on September 11, 2014. For example, she states that no one else had been written up for making personal phone calls before she was written up in September of 2014. Chamness and Wilson reprimanded Cooper on September 20, 2014, for taking a personal phone call that lasted thirteen

minutes. Policy allows employees to engage in personal calls for only five minutes. The disciplinary notice indicated that it was her last written warning, although Cooper had never received previous written warnings for the same conduct. Walker County E-911 policy provides for a verbal warning and three written warnings prior to termination. Cooper received more written reprimands in the weeks after she turned in her paperwork to request FMLA leave than she had received in the prior several years of employment at Walker County E-911.

Cooper began having seizures in April of 2014, although she never had a seizure while on the job at Walker County E-911. She had experienced seizures in 2012, but those did not interfere with her work at Walker County E-911 at all. She had a seizure in 2005 or 2006, about six or seven years prior to 2014. She had her first seizure when she was seven years old, in 1981. When Cooper is about to have a seizure, she usually feels light-headed, smells strange odors, and feels a weird aura. She feels a strange sensation and then lies on the ground to avoid falling. She does not know if she is conscious or unconscious after that because she does not have any memory of the seizure. Her husband has said that sometimes she bites her tongue or cheek during the seizure and sometimes she shakes violently. Her husband also describes her as having jerking movements in her limbs during a seizure. Cooper describes the seizures that involve biting and that last longer than 30 seconds as

"grand mal" seizures and says that it takes her hours to regain her senses after a such a seizure. Her less serious episodes, referred to as "pseudo seizures, last about 30 seconds to a minute and require only 15 to 20 minutes of recovery time.

Cooper never had any type of seizure while at work at Walker County E-911, but she did have a seizure later in the day, or the next day, after her last day of work at Walker County E-911. She also had two seizures on October 1, 2014. She does not recall whether she told Wilson that she had experienced seizures. She has had "multiple hundreds" of seizures since her dispatch job was terminated. In 2014 or 2015, Cooper applied for Social Security disability benefits. She stated in her application that she was physically unable to work at all.

On October 2, 2014, Dr. Batie referred Cooper to a neurologist, Dr. Gilreath. Dr. Gilreath examined Cooper on October 28, 2014. Cooper told Dr. Gilreath that her seizures occurred with an aura of feeling somewhat dazed, which lasted a few seconds, followed by a loss of consciousness. Cooper described falling to the ground, loss of consciousness, closing her eyes, moaning, and jerking and stiffening of the extremities, with some flailing of the head. She also described rare urinary incontinence and tongue or cheek biting. She said the seizures usually last about 60 seconds and then resolve and that it takes about 30 minutes for her to return to baseline. She states that she is confused and lethargic during the 30-minute period.

Cooper told Dr. Gilreath that her seizures were aggravated by significant stress.[13]

Dr. Gilreath opined that Cooper's seizures were not true epileptic seizures, based on the fact that Cooper said she had a seizure during an encephalograph when the test results did not show evidence of seizure activity. He also said that her description of her seizures was not typical of epileptic seizures and that the flailing she described often occurs with psychosomatic events. The doctor further stated that stress as an aggravating factor was not consistent with epileptic seizures, but was consistent with pseudo seizures. Dr. Gilreath testified that Cooper told him on October 28, 2014, that she had been experiencing a seizure every other day for a couple of minutes at a time, and that her seizures had been quite severe since her last visit on October 17, 2014. He noted that Cooper was not responding to anti-epileptic seizure medicine, which he felt further indicated that her seizures were not epileptic seizures but were psychogenic non-epileptic pseudo seizures or spells. He was 99% certain that the events she described were psychogenic spells and not epileptic seizures. He treated Cooper with an anti-depressant as a result of his findings. Dr. Gilreath stated that the pseudo seizures in his opinion were not real seizures, and that the pseudo seizures were "very possible that it was an act of

---

[13]    Cooper's husband testified that he witnessed seizures involving violent shaking in which her eyes would roll back. He said she would be unresponsive after such a seizure for about a minute afterward. He said she would have four to six seizures on most days, and one to two seizures a day on a "good day." (Keith Cooper depo., doc. 30-41, pp. 11-13).

malingering" or "it was a subconscious decision of the patient to have these spells either out of stress or because it's some kind of release for her, ok, much like -- well, let me say this, it's either a malingering type thing or ... a subconscious type thing. In that case we would call it a conversion disorder." (Gilreath depo., doc. 31-25, pp. 77-78). Dr. Gilreath prescribed Zoloft to treat Cooper's anxiety. He also noted that Cooper appeared to be on a number of high-risk prescription medications and that he was concerned about the amount of medication prescribed to Cooper from 2010 to 2014. (Doc. 31-25, pp. 90-92). Dr. Gilreath stated that he believed Cooper could perform her job if given time off to receive treatment for any psychological issues. (Doc. 31-25, pp. 98-101). He further stated that he would be "uncomfortable" having Cooper perform the duties of a 911 dispatcher. [14]

---

[14] The plaintiff moved to strike Gilreath's statement that he would be "very uncomfortable having [the plaintiff] performing those job duties" of a 911 dispatcher, on the sole ground that the defendant did not identify Dr. Gilreath as an expert witness and did not provide a written expert report in accordance with Federal Rule of Civil Procedure 26(a)(2)(B). The defendant asserts that Dr. Gilreath was identified as a witness for the plaintiff in the plaintiff's initial disclosures. Dr. Gilreath was a treating doctor of the plaintiff's and was offered because of his personal knowledge of the plaintiff's medical condition. The court agrees that Dr. Gilreath's testimony does not fall under Rule 26(a)(2)(B) because the plain language of the rule requires a written report only for a "witness retained or specially employed to provide expert testimony in the case." Dr. Gilreath was a fact witness, offered by plaintiff and cross-examined by the defendant. Moreover, the 1993 Advisory Committee Notes explicitly exclude treating physicians from the Rule 26 report requirement. Fed. R. Civ. P. 26(a)(2) Advisory Committee's Notes, 1993 Amendment. See also Brown v. Best Foods, 169 F.R.D. 385, 387 (N.D. Ala. 1996). The plaintiff has not challenged Dr. Gilreath's expertise or qualifications to speak as an expert. Accordingly, the motion to strike the expert opinion testimony (doc. 33) is DENIED. Even so, the court notes that many of Dr. Gilreath's statements refer to a time after Cooper was terminated and after her seizures became more frequent.

However, he testified that there could be reasonable accommodations, such as time off or substance abuse counseling that would enable her to perform her job. (Doc. 30-25, pp. 94-95). Cooper testified that in addition to Dr. Gilreath's assessment, Dr. Pati diagnosed her with epileptic seizures based on her family history, the description of her seizures, and the pseudo seizures she reported.

Keith Cooper, the plaintiff's husband, said she had violent seizures at least once or twice a week from 2013 or 2014 until the end of 2015. According to Keith Cooper, the more violent seizures involved Cooper breaking a tooth, with blood coming from her gums, and foaming of the mouth. After the violent seizures, Cooper would be unable to do anything except sit on the couch or lie down. Keith Cooper observed that some sounds, such as a squealing microphone, watching television, or squealing brakes seemed to trigger the seizures. Cooper continued to have seizures until May of 2017, when she began taking medication that cut down on the seizures drastically, according to Keith Cooper. In May of 2017, her seizures reduced from four to six per day to one or two a day, with some days being seizure-free.

Cooper worked at Lowe's Hardware Store doing stocking and pricing after she was fired from Walker County E-911. She resigned from that job when she got a job with the Walker County Sheriff's Office, which paid more and was in her field

of preference. She was assigned to a position at the county jail, but resigned after she had a seizure at work. Cooper next worked at a Piggly Wiggly grocery store for a short time, but resigned after having several seizures and upper gastrointestinal problems. Her next job was at Scott's Texaco service station as a clerk, but she was unable to continue because she had seizures at work. She did not qualify for FMLA at any of the jobs she had after Walker County E-911 because she did not work at them long enough.

Keith Cooper observed Dana Cooper attempt suicide around May 20, 2017, one day after her daughter refused to speak to her at the daughter's high school graduation. Keith Cooper saw blood on Cooper's wrists, razor blades beside her, and empty medicine bottles in the nightstand beside her bed. She was taken by ambulance to a hospital where she spent several days in a psychiatric ward.

Cooper filed the complaint commencing this action in the Circuit Court for Walker County, Alabama. It was removed to this court. (Doc. 1) The complaint, as amended, sets forth the following claims: (1) wrongful denial of or interference with rights under the FMLA; (2) retaliation based upon her activity protected under the FMLA; (3) failure to accommodate her disability under the Americans with Disabilities Act ("ADA"); (4) discriminatory discharge in violation of the ADA; (5) violation of procedural due process rights under the Alabama Constitution; and

(6) violation of procedural due process rights under the Fourteenth Amendment to the United States Constitution, brought pursuant to 42 U.S.C. § 1983.

## III.   THE DEFENDANT'S MOTION

### A.   Claims Arising Under the ADA (Counts III and IV)

The defendant has moved for summary adjudication of the plaintiff's claims arising under the ADA on grounds that: (1) Walker County E-911 is a state agency protected from claims for money damages under the Eleventh Amendment; (2) the plaintiff was never denied any requested accommodation prior to her termination; (3) the plaintiff is not entitled to protection under the ADA because she was not a "qualified individual" capable of performing the job duties of a 911 dispatcher; (4) the plaintiff never identified a reasonable accommodation that she asked the defendant to provide; and (5) even if the plaintiff established a *prima facie* case under the ADA, Walker County E-911 has articulated a nondiscriminatory reason for her termination, and there is no evidence that the articulated reason is a pretext. The court addresses these arguments in turn.

#### 1.   *Eleventh Amendment Immunity*

The Eleventh Amendment grants immunity from suit not only to the States themselves, but also to "state agencies and entities that function as an arm of the

state." Ross v. Jefferson County Dep't of Health, 701 F.3d 655, 659 (11th Cir.

2012) (internal quotations omitted). Whether an entity is an arm of the state "must

be assessed in light of the particular function in which the defendant was engaged

when taking the actions out of which liability is asserted to rise." Manders v. Lee,

338 F.3d 1304, 1308 (11th Cir. 2003) (*en banc*). Manders solidified a four-factor

test to be used in making such determinations: "(1) how state law defines the entity;

(2) what degree of control the State maintains over the entity; (3) where the entity

derives its funds; and (4) who is responsible for judgments against the entity."

Manders, 338 F.3d at 1309; see also Walker v. Jefferson County Bd. of Educ., 771

F.3d 748, 752 (11th Cir. 2014); Weaver v. Madison City Bd. of Educ., 947 F.

Supp. 2d 1308 (N.D. Ala. 2013), report and recommendation adopted, No.

5:11-CV-3558-TMP, 2013 WL 4433799 (N.D. Ala. Aug. 14, 2013), and aff'd sub

nom. Walker v. Jefferson Cty. Bd. of Educ., 771 F.3d 748 (11th Cir. 2014).

Accordingly, a determination of whether an entity is entitled to the immunity

provided under the Eleventh Amendment is dependent on the law of the state.

See, e.g., Stanley v. Israel, 843 F.3d 920, 924 (11th Cir. 2016).

The burden of demonstrating that an entity is entitled to the immunity

defense is on the entity invoking the defense, and the entity must do so by

demonstrating that it qualifies as an "arm of the state." Haven v. Board of Trustees

of Three Rivers Regional Library Sys., 625 F. App'x 929, 933 (11th Cir. 2015) (per curiam) (quoting Woods v. Rondout Valley Ctr. Sch. Dist. Bd. of Educ., 466 F.3d 232, 237 (2d Cir. 2006)). In addition, the court deciding whether the Eleventh Amendment immunity extends to an entity must analyze the "'particular function in which [the entity asserting the immunity] was engaged when taking the actions out of which liability is asserted to arise.'" Miller v. Advantage Behavioral Health Sys., 146 F. Supp. 3d 1318, 1323 (M.D. Ga. 2015)(quoting Manders, 338 F.3d at 1308), aff'd, 677 F. App'x 556 (11th Cir. 2017).

Even though some entities may be "state agencies" that enjoy state-law sovereign immunity, not all such entities are "arms of the state" entitled to immunity under the Eleventh Amendment. Miller, 146 F. Supp. 3d, 1324 (construing a Georgia statute). This analysis involves viewing the establishment of the entity, and where the state law vests control over the entity. Id. at 1325. In addition, the court may examine the degree of autonomy that the entity retains over the function at issue, in this case, the employment of dispatchers. The source of funding also is an element to be examined, and if an entity can show that it receives all or most of its funding from the state, that factor will weigh in favor of finding that the entity is an "arm of the state" for purposes of the Eleventh Amendment. Where the state is not directly liable for judgments against the entity, however, that fact will

weigh heavily against a grant of the immunity. <u>Abusaid v. Hillsborough County Bd. of County Comm'rs</u>, 405 F.3d 1298, 1312-13 (11th Cir. 2005).

The law of the state of Alabama permits the creation of an E-911 District by the "governing body of any municipality or the governing body of any county that, by passage of a resolution or ordinance, creates a district within its respective jurisdiction...." Ala. Code § 11-98-1(5). The statute further states that the districts "shall be political and legal subdivisions of the state, with power to sue and be sued in their corporate names...." Ala. Code § 11-98-2. The creating authority also is authorized to appoint a local board of commissioners, and gives that board the power to "employ such employees, experts, and consultants as it deems necessary." Ala. Code § 11-98-4(d). Oversight is provided by a statewide 911 Board, pursuant to Ala. Code § 11-98-4.1, and funding is provided by service charges imposed on "each active voice communications service connection in Alabama" that can access a 911 system. Ala. Code. § 11-98-5. The funds are remitted to the 911 Board by the service providers and are in turn disbursed to the districts. <u>Id.</u> The law provides, however, that the "revenues deposited into the 911 Fund shall not be monies or property of the state and shall not be subject to appropriation by the Legislature." Ala. Code § 11-98-5.1(a).

The plaintiff argues that <u>Wassman v. Mobile Communications District</u>, 665 So. 2d 941 (Ala. 1995), established that communications districts such as Walker County E-911 are not subject to Eleventh Amendment immunity. That case, however, addresses only the immunity provided by the Alabama Constitution, and does not examine the application of Eleventh Amendment immunity. The defendant asserts that the state law governing the communications districts was changed in 2012, bringing them under the oversight control of a state 911 Board. Ala. Code § 11-98-13.3. The parties do not provide, and the court does not find, any state or federal court opinions that answer the question of whether a 911 district in Alabama is an "arm of the state" for purposes of Eleventh Amendment immunity. Accordingly, the court must examine the four factors set forth in <u>Manders</u>.[15]

The Alabama Supreme Court applied the four factors to a county board of education in <u>Ex parte Madison County Board of Education</u>, 1 So. 3d 980 (Ala. 2008). The court's analysis of a county school board's assertion of Eleventh

---

[15] An examination of the application of <u>Manders</u> factors to other agencies, however, is instructive. For example, county departments of health have been deemed to be arms of the state because: (1) state law defines the Health Department as an "arm of the state," (2) the head officer of the agency is defined by statute as a "state officer," and (3) the state controls personnel decisions within the Health Department. <u>Ross v. Jefferson Cty. Dep't of Health</u>, 701 F.3d 655, 660 (11th Cir. 2012). County school boards, on the other hand, have consistently been denied Eleventh Amendment immunity from federal claims because of the significant control exerted by local officials, even though they have consistently been deemed state agencies that are entitled to immunity from state-law tort actions under the Alabama constitution. <u>See</u>, <u>e.g.</u>, <u>Walker v. Jefferson Cty. Bd. of Educ.</u>, 771 F.3d 748 (11th Cir. 2014).

Amendment immunity provides a guide to this court's analysis of the immunity defense offered by the Walker County E-911 district, although whether Eleventh Amendment immunity bars a claim is a question of federal law.

In Ex parte Madison County Board of Education, the court first noted that the Alabama legislature specifically "defined and designated the responsibilities of a county board of education." 1 So. 3d at 987. Similarly, the state has defined an E-911 District and has provided that a district may be created by a municipality or county, Ala. Code § 11-98-2. Individual E-911 districts are not creatures of the State or an agency of the State, but rather of the local municipal or county government. Likewise, governance of an E-911 district is under local control. The creating authority may "appoint a board of commissioners composed of seven members to govern its affairs...." Ala. Code § 11-98-4. As with the county school board in Ex parte Madison County Board of Education, the Walker County E-911governing board "maintains significant authority with regard to the employment and conduct of its [employees]." 1 So. 3d at 988. The local control over the board's actions, the Alabama Supreme Court has determined in evaluating the first Manders factor, "lends little weight" to an argument that the board is an arm of the state entitled to Eleventh Amendment immunity. Id.

The Alabama Supreme court addressed the second factor by examining whether the state superintendent of education had final, binding authority over decisions by the county board.   Even though the statewide school board had "broad powers," the court relied upon the fact that the state had vested in county boards of education the authority to transfer, suspend, or dismiss teachers—the conduct from which the liability in that case arose—and found that the second factor did not weigh in favor of the Board's "arm of the state" argument.   Similarly, the statutes governing emergency telephone services in Alabama vest the ability to "employ such employees as necessary" to implement its functions in the local boards of commissioners, and not in the state.   The second Manders factor, as explained in Ex parte Madison County Board of Education, does not weigh in favor of a finding that the board is an arm of the state.   1 So. 3d at 988.

The third factor involves an examination of where the board derives its funds. In this case, the defendant argues that Walker County E-911 receives all of its funding from the State of Alabama.   The statutes governing the emergency districts sets up a system for the collection of fees by all communications providers from the users of those systems, which is then remitted to the state board to be distributed to the individual districts.   The statute specifically provides that the funds are not "monies or property of the state."   Ala. Code § 11-98-5.2(a).   The funds are not

"tax" revenue and they are not administered by the state treasury. This weighs against a finding that E-911 districts are "arms of the state."

As for the fourth factor, there is no evidence in this case that provides any information as to what entity is responsible for a judgment against the Walker County E-911. The parties have not argued, the statutes do not indicate, and the court is not willing to conclude, that any judgment would be paid from "state funds" as would support a finding that the board is entitled to Eleventh Amendment immunity. 1 So. 3d at 989. Because such emergency districts are suable in their own names, the more likely conclusion is that any money judgments against them are collectable out of their own allocated funds as well.

Accordingly, having weighed the four factors mandated by Manders, the court finds that Walker County E-911 is not an "arm of the state" entitled to Eleventh Amendment immunity. Consequently, the defendant is not entitled to summary adjudication of the plaintiff's ADA claims on grounds of Eleventh Amendment immunity, and the motion on that basis is due to be denied.

### 2. "Qualified Individual" Under the ADA

The conduct about which plaintiff complains occurred in 2014, makes it subject to the Americans with Disabilities Act Amendments Act ("ADAAA") enacted on January 1, 2009. The general effect of these amendments was to

broaden the ADA's coverage.  See 42 U.S.C. § 12101 note (2008) (Findings and Purposes); see also 29 C.F.R. § 1630.1(c)(4) ("The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA.").  In keeping with the broad scope of the ADAAA, the EEOC modified the ADA regulations addressing the definition of the term "substantially limits" with regard to the determination of a disability, effective May 24, 2011.  29 C.F.R. § 1630.2(j).

In order to state a claim under the prevailing law, the plaintiff must show that she: (1) had a disability[16]; (2) was otherwise qualified to perform the job; and (3) was discriminated against based on her disability.  Lopez v. AT&T Corp., 457 F. App'x 872, 874 (11th Cir. 2012).   In this case, the defendant does not challenge whether the plaintiff meets the broad definition of "disabled."  The plaintiff has provided records that describe her gastrointestinal disorder, and the defendant does not dispute that her gastrointestinal disorder meets the extremely broad definition of a disability under the statutes that governs this case.   Instead, the defendant asserts that Cooper was not "otherwise qualified" to perform the job of 911 dispatcher because of her seizure disorder.

---

[16]     Generally speaking, a person has a "disability" if she suffers from a physical or mental impairment that "substantially limits" a "major life activity."

The defendant argues that Cooper cannot present evidence that she was a "qualified individual" capable of performing the job duties of a 911 dispatcher. The term "qualified individual with a disability" is statutorily defined as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."   42 U.S.C. § 12111(8); see Moore v. Jackson County Bd. of Educ., 979 F. Supp. 2d 1251, 1261–62 (N.D. Ala. 2013).   Pursuant to 29 C.F.R. § 1630.2(m), a qualified individual with a disability is an "individual with a disability" who "satisfies the requisite skill, experience, education, and other job-related requirements of the employment position such individual holds or desires and, with or without reasonable accommodation, can perform the essential functions of such position."   An employee with a disability who actually has performed in the desired position for several years should be deemed to be a qualified individual.   See, e.g., Barton v Tampa Elec. Co., 1997 WL 128158 at *3 (N.D. Fla. Jan. 11, 1997).

In this case, the defendant's argument rests on the assertion that Cooper complained of "numerous seizures" that occurred during the last two months of her employment, followed by "multiple hundreds" of seizures that have occurred since her employment was terminated on October 2, 2014.   It is undisputed, however, that Cooper never had a seizure at work prior to her termination.   There also is no

evidence that any seizure that occurred before October 2, 2014, interfered with her ability to work. Finally, the defendant makes no assertion that the gastrointestinal disorder that was the cause of Cooper's FMLA leave and her request to leave early on the last day she worked rendered her "unqualified" or unable to perform any essential job functions of an E-911 dispatcher. Defendant argument rests entirely on the seizures that Cooper experienced. Because the uncontroverted evidence supports a conclusion that the seizures interfered with her ability to work only *after* her termination, the seizures become relevant only when or if the subject of damages, reinstatement, or front pay is addressed. Not only had Cooper not experienced any seizure at work, there is no evidence that Walker County E-911 was aware of any seizure disorder and, thus, it could not have served as a basis for the determination that she could not work. In short, the plaintiff has offered substantial evidence that she was not terminated by Walker County E-911 because she was not a "qualified individual" due to her seizure disorder. Accordingly, the argument that plaintiff did not meet the definition of being a "qualified individual" because her seizures is without merit. At the time of her termination of employment, there was no evidence that she could not perform the essential functions of the job, with or without accommodation. The motion for summary judgment of her ADA claims on that basis, therefore, is due to be denied.

### 3. Failure to Accommodate

The defendant next asserts that, even if Cooper was disabled and a qualified individual under the ADA, there is no evidence to support her claim that Walker County E-911 failed to provide her with a requested accommodation. The parties agree that Cooper first requested being allowed to leave work about two hours early on September 30, 2014, because she was vomiting. Insofar as this request constitutes an "accommodation" under the ADA, the record indicates it was granted. The accommodation of leaving work early was not "denied" for purposes of asserting a failure to accommodate.

The second request for accommodation the parties describe was a request by the plaintiff for time off after October 2, 2014, the date on which her employment was terminated. The defendant characterizes the plaintiff's request as one for time off from October 2014 until May 2017 on the basis that her seizures did not become controllable until 2017. The plaintiff, however, asserts that she sought accommodation in a much more limited form. She contends that at the meeting on October 2, 2014, in which she was terminated, she requested time off until October 21, 2014, in accordance with the doctor's note that she brought with her to the meeting with Wilson and Walden on October 2, 2014.

The undisputed evidence shows that by that date, Wilson and Walden already had decided to terminate Cooper's employment and that the purpose of the meeting simply was to inform her of the decision.[17]   A request for accommodation that comes post-termination does not trigger the employer's duty.   "In the absence of a timely request; in the absence of a request for a definite period; and in the absence of any evidence that a definite period available to plaintiff would have cured h[er] problem, the court cannot find that plaintiff has satisfied h[er] burden of requesting a reasonable accommodation."   Rogers v. CH2M  Hill, Inc., 18 F. Supp. 2d 1328, 1341 (M.D. Ala. 1998) (dismissing claim where plaintiff failed to notify the employer of his disabling depression and to propose any sort of accommodation until after he was discharged).   For the request to be timely, an "employee must make the request for an accommodation while 'on the job,' not after the fact." Alvarez v. School Bd. of Broward County, 208 F. Supp. 3d 1281, 1285 (S.D. Fla. 2016).   Because the decision to terminate her employment already had been made, even if the doctor's note constituted a request for an accommodation, it was not refused, because the decision already had been made regarding her termination.

---

[17]   The court does not speculate here about the motive or reason for her termination, but only to note that the decision to terminate her was made on October 1, and that she was called to come to the meeting the next day for the purpose of informing her of it.

To the extent that it might be argued that the defendant chose to fire Cooper rather than to accommodate her request for time off, that claim is more aptly addressed as a claim that she was retaliated against on the basis of her disability or because of her use of leave under the FMLA. Those claims will be addressed *infra* in relation to the defendant's proffered non-discriminatory reason for the termination. To the extent that the defendant seeks dismissal of a "failure to accommodate" claim under the ADA, the motion for summary judgment is due to be granted.

### 4. Retaliatory Discharge

Walker County E-911 asserts that it is entitled to summary adjudication of the retaliatory discharge claim on the ground that the undisputed evidence shows that reason for Cooper's termination was because of poor job performance and insubordination, not because of her disability. Under prevailing law, claims arising under the ADA that are not supported by direct evidence of discrimination are evaluated by the court under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973); Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004). Even when a plaintiff has met her initial burden by establishing a *prima facie* case of discriminatory discharge under the ADA, if the defendant articulates a legitimate,

nondiscriminatory reason for the termination, the burden shifts back to the plaintiff to demonstrate that the reason articulated is a mere pretext and that the real reason for her termination was illegal discrimination. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004).

To meet her burden of showing that Walker County E-911's proffered reason for dismissing her—poor job performance and insubordination—was pretext, she must show both that the reasons are false, and that discrimination was the real reason. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993). The Eleventh Circuit Court of Appeals has noted that a plaintiff must meet the proffered reason "head on and rebut it." Chapman v. AI Transport, 229 F.3d 1013, 1030 (11th Cir. 2000). The plaintiff's evidence must reveal "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence." Combs v. Plantation Patterns, 106 F.3d 1519, 1538 (11th Cir. 1997). The plaintiff may demonstrate the pretext by "either proving that intentional discrimination motivated the employer or producing sufficient evidence to allow a rational trier of fact to disbelieve the legitimate reason proffered by the employer, which permits, but does not compel, the trier of fact to find illegal discrimination." Wilson, 376 F.3d at 1088 (citations

omitted).  Therefore, Cooper may create an issue of fact as to whether the real reason for her termination was illegal discrimination either by presenting evidence that Walker County E-911's proffered reason is not worthy of belief such that a reasonable juror could infer that discrimination was the real reason, or by presenting evidence that a discriminatory motive was the real reason.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146-147, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000); see also Scott v. Shoe Show, Inc., 38 F. Supp. 3d 1343, 1362 (N.D. Ga. 2014).

A close proximity in time between request for an accommodation under the ADA and the adverse employment action can provide evidence of pretext.  See, e.g., Hurlbert v. St. Mary's Health Care Sys., Inc., 439 F.3d 1286, 1298 (11th Cir. 2006) (finding that a two-week span between protected conduct and termination was evidence of pretext); Wascura v. City of South Miami, 257 F.3d 1238, 1244-45 (11th Cir. 2001).  In addition, an employer's failure to articulate clearly and consistently the reason for the termination may be evidence of pretext.  Hurlbert, 439 F.3d at 1298.  Another fact that may present evidence of pretext is an employer's deviation from its standard hiring or disciplinary procedures.  See Bass v. Bd. of County Com'rs, Orange County, Fla., 256 F.3d 1095, 1108 (11th Cir. 2001).

Viewing the facts of this case in the light most favorable to the nonmoving plaintiff, the court concludes that Cooper has met her burden of demonstrating that the purported performance issues and accusation of insubordination were not the real reasons for her termination and that either her disability or her use of FMLA leave[18] was the real reason for the employment decision. Cooper's evidence meets each of the factors set forth in the case law: (1) whether the real reason for her termination was discriminatory; (2) a close proximity in time between her absence and her termination; (3) and a failure to follow disciplinary policies and to articulate a non-discriminatory reason for the firing at the time.

On the issue of insubordination, Cooper has testified that she did not raise her voice or refuse any orders from Chamness, that she merely told Chamness she was ill and that she believed she was still covered by her FMLA leave. She told Chamness that she should not be required to present a doctor's excuse to document her illness upon her return to work, but she agreed to do so. She clearly asked to be

---

[18]     Although Cooper seeks redress through the distinct vehicles presented by the ADA and the FMLA, both require a finding of discriminatory animus. It is not generally possible to determine in a situation like this one whether the alleged animus arose from the plaintiff's disability or from her use of the leave act to attempt to deal with symptoms of the disabling conditions. It matters not. So long as the plaintiff has presented evidence that the motivating factor in her termination was a discriminatory animus, the defendant is not entitled to summary adjudication of either the FMLA or ADA claim for retaliatory discharge simply because she cannot identify which provided the discriminatory animus. It also is worthy of note that these two claims intersect and mingle: Cooper took FMLA leave because of the disorder that is also alleged to be disabling.

allowed to leave her shift two hours early because she was vomiting, which Chamness and the surveillance video confirm. A close viewing of the surveillance video seems to show that Cooper never acted in an insubordinate manner; she did not shout or raise her voice, nor did she argue unreasonably with Chamness or undermine her authority. These facts, along with the video and audio recording of the incident, present a fact dispute as to whether the employer actually believed that Cooper's actions constituted insubordination or whether the real reason for her termination was discriminatory.

As to the issue of temporal proximity, Cooper has demonstrated that her firing came just three weeks after she returned from the FMLA leave that was related to her gastrointestinal disorder, and just two days after she became ill at work with the same symptoms. In addition, she has shown that she was still having the health issues that gave rise to her leave and might require additional time off as an accommodation for her disabling condition.[19]

Cooper also has presented evidence that shows that Walker County E-911 did not follow its own disciplinary policy in that her performance issues were not met with the progressive disciplinary steps set forth in the district's progressive

_____

[19]    Because the defendant has not disputed that Ms. Cooper's gastrointestinal disorder is a disability, the court assumes without deciding that it is a disability within the meaning of the ADA.

discipline policy. While she did receive some warnings, she did not receive a written warning for the purported behavior that preceded her termination (i.e., insubordination), and she was not given an opportunity to file any grievance as set forth in the employee handbook. In addition, Walker County E-911 did not articulate clearly at the time it terminated Cooper that insubordination or performance issues were the reason for the firing. There is evidence that these reasons were only first articulated to Cooper later, in response to the filing of her EEOC complaint.

For all of these reasons, the defendant's motion for summary adjudication of the discriminatory discharge claim under the ADA is due to be denied.

### B.   Claims Arising Under the FMLA (Counts I and II)

The defendant seeks dismissal of the plaintiff's claims arising under the FMLA on grounds that (1) Walker County E-911 is a state agency protected from claims for money damages under the Eleventh Amendment;   (2) the defendant did not "interfere" with her FMLA rights because she was not on FMLA leave at the time she was terminated and had not requested a second FMLA period until after she was terminated, and (3) the plaintiff has no evidence that the non-discriminatory reasons given for her termination are a pretext for discrimination.

The court's analysis of Walker County E-911's entitlement to protection under the Eleventh Amendment is discussed *supra* in connection with the plaintiff's ADA claims and is equally applicable to her claims under the FMLA. Walker County E-911 is not an "arm of the state" entitled to Eleventh Amendment immunity. Similarly, the plaintiff's evidence that the non-discriminatory reasons given for her termination are pretextual also prevents the defendant from escaping liability based upon the articulation of a non-discriminatory reason for its employment action. There is substantial evidence in the record from which a reasonable factfinder could question the credibility of the defendant's proffered reasons for the plaintiff's dismissal. This leaves only the question whether there is substantial evidence supporting Cooper's claim that Walker County E-911 interfered with her rights under the FMLA.

The FMLA creates two distinct types of claims: interference claims and retaliation claims. Strickland v. Water Works & Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1206 (11th Cir. 2001). "[T]he FMLA creates two types of claims: interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, see 29 U.S.C. § 2615(a)(1), and retaliation claims, in which an employee asserts that his employer discriminated against him because he engaged in activity protected by the Act…."

Id. (citing 29 U.S.C. § 2615(a)(1) & (2); 29 C.F.R. § 825.220(c)); see also Bartels v. S. Motors of Savannah, Inc., 681 F. App'x 834, 837 (11th Cir.), cert. denied, ___ U.S. ___, 138 S. Ct. 358, 199 L. Ed. 2d 263 (2017).

An employee seeking to state an "interference" claim under the FMLA must demonstrate by a preponderance of the evidence that [she] was entitled to a benefit the employer denied. Strickland v. Water Works and Sewer Bd. of City of Birmingham, 239 F.3d 1199, 1205 (11th Cir. 2001). The FMLA allows a qualifying employee to take up to twelve weeks of unpaid leave to deal with family or medical issues. Schaaf v. Smithkline Beecham Corp., 602 F.3d 1236, 1241 (11th Cir. 2010) (citing 29 U.S.C. § 2612(a)(1)(A); Martin v. Brevard County Pub. Sch., 543 F.3d 1261, 1265 (11th Cir. 2008)). The leave provided by the FMLA may be "intermittent," when certified as medically necessary. See Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 592 (11th Cir. 2017) ("[L]eave generally may be taken intermittently—that is, "in separate blocks of time due to a single qualifying reason"); Hegre v. Alberto-Culver USA, Inc., 485 F. Supp. 2d 1367, 1378 (S.D. Ga. 2007), aff'd, 275 F. App'x 872 (11th Cir. 2008)[20]; see also 29 C.F.R. §§ 2612(b)(1),

---

[20]  29 C.F.R. 825.203 states in relevant part:

Eligible employees may take FMLA leave on an intermittent or reduced schedule basis when medically necessary due to the serious health condition of… the employee…. Eligible employees may also take FMLA leave on an intermittent or reduced schedule basis when necessary because of a qualifying exigency. If an

825.203(c). Such intermittent leave may be either for "planned medical treatment" or "unforeseeable." See Kaylor v. Fannin Regional Hosp., Inc., 946 F. Supp. 988, 999 (N.D. Ga. 1996). If intermittent leave is necessary for "planned medical treatment," the employee is required to give the employer thirty-days' notice of the need for leave. Where the need for intermittent leave is unforeseeable, the employee need only give the employer notice "'sufficient to make the employer aware that her absence is due to a *potentially FMLA-qualifying reason*.'" Cruz v. Publix Super Markets, Inc., 428 F.3d 1379, 1382 (11th Cir. 2005) (quoting Gay v. Gilman Paper Co., 125 F.3d 1432, 1436 (11th Cir. 1997) (emphasis added in Cruz). "[W]hen an employee takes unforeseeable FMLA leave (less than 30 days' notice), the employee must notify the employer as soon as practicable in compliance 'with the employer's usual and customary notice and procedural requirements for requesting leave,' and the employee must 'respond to an employer's questions designed to determine whether an absence is potentially FMLA-qualifying." Diamond v. Hospice of Fla. Keys, Inc., 677 F. App'x 586, 593 (11th Cir. 2017) (quoting 29 C.F.R. § 825.303(a)–(b)). A district court has explained:

---

employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then the employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations.

29 C.F.R. § 825.203

If an employee has previously taken FMLA leave and requires additional or subsequent FMLA leave for the same serious health condition, the "employee must specifically reference either the qualifying reason for leave or the need for FMLA leave." 29 C.F.R. § 825.303(b). Calling in "sick" without providing more information is not sufficient notice under the FMLA. <u>Id</u>. In determining whether [employee's] notice was sufficient "'the critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition.'"

<u>Shelton v. Price Waterhouse Coopers, LLP</u>, No. 8:12-CV-02757-T-27, 2014 WL 2581348, at *3 (M.D. Fla. May 2, 2014); <u>see also</u> <u>Smith v. Constr. Datafax, Inc.</u>, 871 F. Supp. 2d 1226, 1234 (N.D. Ala. 2012) (when FMLA leave is unforeseeable, the employee must give the employer notice he is taking FMLA leave as soon as practicable). Whether the notice given is sufficient for FMLA purposes is a mixed question of fact and law, with the factfinder determining what notice was given and the court deciding whether such was legally sufficient. <u>Shelton v. Price Waterhouse Coopers, LLP</u>, No. 8:12-CV-02757-T-27, 2014 WL 2581348, at *4 (M.D. Fla. May 2, 2014) (citing <u>Strickland v. Water Works & Sewer Bd. of City of Birmingham</u>, 239 F.3d 1199, 1208 (11th Cir. 2001)). Also, for intermittent leave, the employer may require the employee to provide certification from a healthcare provider that the employee's condition is incapacitating and that intermittent leave is medically necessary. <u>Cf.</u> <u>Ferguson v. N. Broward Hosp. Dist.</u>, 478 F. App'x 565,

567 (11th Cir. 2012) (employee's doctor did not certify that employee's diabetes was incapacitating).

Further, an employee returning to work after taking FMLA leave has the right "to be restored by the employer to the position of employment held by the employee when the leave commenced" or to an equivalent position. 29 U.S.C. § 2614(a)(1)(A); <u>see also</u> 29 C.F.R. § 825.214(a). But an employer can deny reinstatement following FMLA leave if it can demonstrate that it would have discharged the employee even if she had not been on FMLA leave. <u>Martin v. Brevard County Public Schools</u>, 543 F.3d 1261, 1267 (11th Cir. 2008); <u>see also</u> 29 U.S.C. § 2614(a)(3); 29 C.F.R. § 825.216(a). This is so because, upon proof of a reason for termination unrelated to the FMLA leave, the taking of FMLA leave is not the "proximate cause" for the termination; rather, the proximate cause for the termination is the other, non-FMLA-related reason. <u>See</u> <u>Schaaf v. Smithkline Beecham Corp.</u>, 602 F.3d 1236, 1242 (11th Cir. 2010) (explaining the distinction between "proximate cause" and "but-for cause" in the context of an FMLA interference claim). Upon an employee's return and restoration to her former position (or an equivalent one), any subsequent adverse employment action cannot support an interference claim (although it might support a retaliation claim). Upon

restoration to an employee's former position (or an equivalent one), a subsequent adverse employment action does not deny the employee any "benefit" under the Act.

Turning to the facts of the case, the defendant has demonstrated that the plaintiff was not on FMLA leave when she was terminated because the doctor's letter that permitted her return to work advised that she was able to work without restriction. Although Cooper notified her employer on August 26, 2014, that she would take FMLA leave from that date until October 13, 2014, she notified Walker County E-911 on September 10 that her doctor had cleared her to return to work on September 11. She produced a note from her doctor saying that, although Cooper continued under her care, she could return to work on September 11 with no restrictions. The note did not indicate at all that Cooper would need intermittent time off for treatment of her gastrointestinal disorder. It appeared at that point that Cooper was no longer on FMLA or had any need for it. There is no evidence that she did or said anything to Walker County E-911 indicating that she wanted leave beyond the two hours being taken to leave work early. Although Cooper believed that her FMLA leave continued or could be re-established, it was not until September 30 that she became ill, asked to leave work two hours early, and claimed that it was FMLA leave previously approved. Also, she did not notify the defendant that she wanted leave to continue beyond the two hours taken to leave

early on September 30. In any event, it is undisputed that she was granted the two hours' leave she requested on September 30.[21] Thus, with respect to the time used to leave work early on September 30, there was no interference—Cooper was granted the time off.

On October 1, 2014, Wilson and Walden met, reviewed the plaintiff's employment, the incident the previous day with Chamness, and concluded that her employment should be terminated. Wilson telephoned the plaintiff to request that she meet with him the next day, October 2, with his purpose being to inform her of his decision. When Cooper appeared the next day, she attempted to give Wilson a note from her doctor requiring the plaintiff to remain off work until October 21, 2014, but Wilson refused to accept the note, saying she already had been terminated for insubordination. This refusal was not interference with her right to benefits under the FMLA. A former employee may not attempt to seek FMLA leave *after* her employment has ended. Where the employer has determined to terminate an employee for reasons unrelated to a request for FMLA leave, there is no interference claim. "[A]n employee can be dismissed, preventing her from exercising her right to commence FMLA leave, without thereby violating the FMLA, if the employee

---

[21] To the extent she contends that Walker County E-911's insistence that she present a doctor's note upon her return to work was "interference" with her FMLA leave, the Act allows the employer to require the employee to provide a certification from a healthcare provider that the need for leave springs from a serious medical condition, as distinct from a transient illness.

would have been dismissed regardless of any request for FMLA leave." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010). Here, Wilson and Walden made the decision to terminate the plaintiff on October 1, prior to her attempt to request FMLA leave on October 2. Because it is undisputed that the termination decision was made before the attempt to commence leave occurred and without any knowledge that she would request leave on October 2,[22] the plaintiff was not denied any FMLA benefit and she has no interference claim.

The defendant's motion thus turns upon whether Cooper "would have been dismissed regardless of" her use of the FMLA leave. Kurtzig v. Pulte Home Corp., 602 F.3d 1231, 1236 (11th Cir. 2010); see also Jarvela v. Crete Carrier Corp., 776 F.3d 822, 831 (11th Cir. 2015); Defreitas v. Horizon Inv. Mgt. Corp., 577 F.3d 1151, 1161-62 (10th Cir). The undisputed evidence shows that Cooper had not been denied an FMLA benefit when she was terminated on October 1 and notified of the decision on October 2. The defendant is entitled to summary judgment on her FMLA interference claim.

---

[22]     Plaintiff returned to work on September 11 with no medical restrictions from her doctor. On September 30, she sought leave only for two hours to leave work early. She made known her opposition to going to the doctor to get a note because she had medicine at home for her gastrointestinal disorder, indicating that she did not believe she would need leave time after leaving work early. When she appeared on October 2, she had a new note for an entirely new seizure disorder. Under these circumstances Wilson and Walden could not have known and did not know that she would request FMLA leave for seizures when they made the decision to terminate her employment the day before.

On the other hand, there are genuine issues of material fact that preclude summary judgment on Cooper's FMLA *retaliation* claim. She had returned to work after taking FMLA leave on September 11, only twenty days before Wilson and Walden decided to terminate her employment. Even closer temporal proximity occurred with Cooper took two hours of FMLA leave on September 30 to leave work early due to her gastrointestinal illness. As already mentioned, there are disputes of fact that raise questions about the articulated reason for her termination—insubordination. The defendant's motion for summary judgment as to Cooper's claim that her termination was in retaliation for taking FMLA leave is due to be denied.

## C. Claims Asserting Violation of Due Process Rights (Counts V and VI)

The plaintiff's claims that her procedural due process rights[23] under both the Alabama and United States Constitutions were violated are the subject of both the defendant's motion for summary judgment and a cross motion filed by the plaintiff seeking judgment in her favor on these two claims. It is well settled that the due

---

[23] Although the Amended Complaint does not explicitly identify these claims as alleging violation of procedural due process, the nature of the claims is clear for several reasons. First, the Amended Complaint alleges deprivation of employment-related property and statutory rights, not fundamental rights. See McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994). Second, the description of the claim in the Amended Complaint sounds in procedural due process, in that it alleges that plaintiff's employment was "terminated without just cause," and that she was not given notice of the disciplinary charges against her and the evidence supporting the charges, and she was not given a chance to be heard by an impartial hearing officer. Amended Complaint, Doc. 1, ¶¶ 80, 85.

process rights provided under the Alabama Constitution are no more expansive than the rights guaranteed under the Fourteenth Amendment of the United States Constitution, and are subject to the same analysis. The Alabama Supreme Court "has consistently interpreted the due process guaranteed under the Alabama Constitution to be coextensive with the due process guaranteed under the United States Constitution." Vista Land and Equip., LLC v. Computer Programs & Sys., Inc., 953 So.2d 1170, 1174 (Ala. 2006); City of Orange Beach v. Duggan, 788 So.2d 146, 150-53 (Ala. 2000); see also Longmire v. City of Mobile, No. CV 16-0025-WS-M, 2017 WL 1352226, at *17 (S.D. Ala. Apr. 10, 2017). Accordingly, the court need not provide separate analyses of state and federal rights, but does look to state law for interpretation of the alleged employment contract.

Under prevailing law, public employees who have a property right in continued employment cannot be deprived of that right without being afforded notice of the reason for the termination and an opportunity to be heard. The Supreme Court has explained:

> An essential principle of due process is that a deprivation of life, liberty, or property "be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S. Ct. 652, 656, 94 L. Ed. 865 (1950). We have described "the root requirement" of the Due Process Clause as being "that an individual be given an opportunity for a hearing before he is deprived of any significant property interest."

> *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S. Ct. 780, 786, 28 L. Ed. 2d 113 (1971) (emphasis in original); *see Bell v. Burson*, 402 U.S. 535, 542, 91 S. Ct. 1586, 1591, 29 L. Ed. 2d 90 (1971).  This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment.  *Board of Regents v. Roth*, 408 U.S. at 569–570, 92 S. Ct. at 2705; *Perry v. Sindermann*, 408 U.S. 593, 599, 92 S. Ct. 2694, 2698, 33 L. Ed. 2d 570 (1972).

<u>Cleveland Bd. of Educ. v. Loudermill</u>, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493, 84 L. Ed. 2d 494 (1985).  The Due Process Clause provides a right to certain procedures before the state takes away an employee's property right in her employment.  "The essential requirements of due process... are notice and an opportunity to respond."  <u>Loudermill</u>, 470 U.S. at 546.  An employee with a property right in her employment is entitled to certain procedures, but not to any substantive rights under the Due Process Clause.  <u>McKinney v. Pate</u>, 20 F.3d 1550 (11th Cir. 1994) (holding that employment rights are state-created and are not fundamental rights that are created by the Constitution).

The vast majority of cases dealing with a violation of procedural due process rights in the employment context arise when an employee is discharged. Resolution of such a case begins with an examination of whether the employee had a state-created property interest in continued employment.  While an at-will employee generally has no such property interest, a protectable interest has been

found to exist in the realm of public employment where "existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." Board of Regents of State Colleges v. Roth, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709, 33 L. Ed. 2d 548 (1972); see also Loudermill, 470 U.S. at 541.

The Eleventh Circuit Court of Appeals has observed that Alabama law generally views employment to be "at will," meaning that both the employer and the employee remain free to termination the employment relationship at any time for any reason or no reason at all. In LaFleur v. Hugine, 587 F. App'x 536 (11th Cir. 2014), the court stated:

> Employment in Alabama "is terminable at will by either party for any reason unless there is an express and specific contract for lifetime employment or employment for a specific duration." *Howard v. Wolff Broad. Corp.*, 611 So.2d 307, 310 (Ala. 1992). "At-will" employment may be terminated "with or without cause or justification," and employees "bear a heavy burden of proof to establish that an employment relationship is other than 'at will.'" *Id.* at 310–11 (citation and some internal quotation marks omitted). Because an at-will employee does not have a property interest in continued employment, she is "not entitled to procedural due process in connection with her termination." *Adams v. Bainbridge–Decatur Cnty. Hosp. Auth.,* 888 F.2d 1356, 1366 (11th Cir. 1989).

LaFleur, 587 F. App'x at 541-42. The state supreme court has recognized that Alabama's at-will employment doctrine is "harsh," but that it nevertheless "remains

the law in Alabama." Howard, 611 So. 3d at 309 (quoting Allied Supply Co. v. Brown, 585 So. 2d 33, 35 (Ala. 1991)). The federal appellate court has further noted that "[u]nder Alabama law, absent a valid employment contract, employment is at-will" and that, "[a]s a result, there can be no protected property interest in continued employment." LaFleur, 587 F. App'x at 541-42 (citing Howard, 611 So. 2d at 310; Selby v. Quartrol Corp., 514 So. 2d 1294, 1295 (Ala.1987)).

To prove that a valid employment contract exists and to avoid the harsh at-will rule, the Alabama Supreme Court requires that an employee show that three conditions are met in an employment relationship:

> (1) that there was a clear and unequivocal offer of lifetime employment or employment of a definite duration;
>
> (2) that the hiring agent had authority to bind the principal to a permanent employment contract; and
>
> (3) that the employee provided substantial consideration for the contract separate from the services to be rendered.

Howard, 611 So. 2d at 309, (quoting Hoffman-La Roche, Inc. v. Campbell, 512 So. 2d 725, 728 (Ala. 1987) (citations omitted)). Alabama law provides that a contract for permanent employment may be made orally, Green v. City of Hamilton Housing

Auth., 937 F.2d 1561, 1564 (11th Cir. 1991),[24] and that provisions of an employee handbook may create a permanent employment contract. See Hoffman-Laroche, 512 So. 2d at 737; Ex parte Graham, 702 So. 2d 1215 (Ala. 1997). The handbook language may create such a contract, but only if it is specific enough to constitute an offer of permanent employment, it is communicated to the employee, and the employee accepts the offer by continuing to work. Wyatt v. BellSouth, Inc., 998 F. Supp. 1303, 1310 (M.D. Ala. 1998); Anderson-Free v. Steptoe, 970 F. Supp. 945, 955 (M.D. Ala. 1997) ("Hoffman–LaRoche established a three-prong test to determine whether a policy contained in an employee handbook is sufficient to create a contract. The language in the handbook must be specific enough to constitute an offer, the handbook must have been issued to the employee, and the employee must have accepted the offer by retaining employment after having been issued the handbook."). Where an employer "does not wish the policies contained in an employee handbook to be construed as an offer for a unilateral contract, he is free to so state in the handbook." Hoffman-LaRoche, 512 So. 2d at 734-35. However, when the handbook limits the employer's ability to terminate the employment only in instances of "cause," the employee has an expectation of

---

[24]     An employment contract for a specified time of more than one year, however, would be subject to Alabama's Statute of Frauds, requiring that it be in writing. See Price v. Univ. of Ala., Case. No. 03-15511, 2004 WL 1253201, *2 (11th Cir. April 20, 2004).

continued employment sufficient to require procedural due process.  Nicholson v. Gant, 816 F.2d 591, 597 (11th Cir. 1987) (holding the county employee was entitled to due process when employment handbook required "cause" for termination). "Whether the terms of a handbook meet the requirements of a contract offer is generally a question of law to be decided by the court."  Butler v. Cleburne Cty. Comm'n, No. 1:10-CV-2561-PWG, 2012 WL 2357740, at *20 (N.D. Ala. Jan. 17, 2012), report and recommendation adopted, No. 1:10-CV-2561-PWG, 2012 WL 2357741 (N.D. Ala. June 14, 2012) (citing Dykes v. Lane Trucking, Inc., 652 So.2d 248, 250 (Ala.1994); Carr v. Stillwaters Dev. Co., 83 F. Supp. 2d 1269, 1278 (M.D. Ala.1999).  However, the Eleventh Circuit Court of Appeals, in deciding a motion for summary judgment, applied Alabama's three-prong Hoffman-LaRoche test to determine whether an employee handbook provided an employee with a property interest in his continued employment and held that, while the determination generally turns upon a matter of law, where "[g]enuine issues of material fact exist in the record under the *Hoffman-LaRoche* analysis... summary judgment was not appropriate."  Lassiter v. Covington, 861 F.2d 680, 684 (11th Cir. 1988). Therefore, the court turns to the three factors set forth in Hoffman-LaRoche to determine whether Cooper, as a matter of law, had a contract for permanent

employment sufficient to create a recognized property interest in her employment for purposes of procedural due process protections.

In this case, Cooper has alleged that her employment was terminated by Walker County E-911 before she was given adequate notice of the charges against her or an opportunity to present her "side of the story." <u>Loudermill</u>, 470 U.S. at 546.[25] There is no dispute that, if she had a property interest in continued employment, she was denied notice and a pre-termination hearing. However, the defendant challenges the plaintiff's due process claims by asserting that Cooper was an at-will employee and had no protected property interest in her employment. The defendant relies upon the application form submitted by the plaintiff when she first sought employment with the defendant in 2009, which indicated that she agreed that her employment could be terminated "with or without cause, and with or without notice, at any time." (Doc. 30-2, p. 2). The application form further stated the "terms and conditions of [her] employment may be changed, with or without cause, and with or without notice, at any time by the company." The form also provided that any change to her employment had to be in writing and signed by "the president."

---

[25] It is well settled that procedural due process requires some type of a hearing prior to discharge, and that a post-termination hearing is not sufficient. <u>See</u> <u>Enterprise Fire Fighters' Ass'n v. Watson</u>, 869 F. Supp. 1521, 1539-41 (M.D. Ala. 1994).

In opposition to the defendant's motion, Cooper has asserted that the Director of Walker County E-911, Roger Wilson, told her at the time she was hired that, once she got through a 90-day probationary period, she would have a permanent position and could be fired only for good cause and only after she received one verbal and three written reprimands for the same infraction or misconduct. In addition, Stockman, the chairman of Walker County E-911's board of directors, testified that it would be a violation of "policy" to fire an employee without just cause. The plaintiff's employment status is further defined by the employee handbook, which can be interpreted to implement a policy that employees will not be terminated without cause.

To determine whether Cooper has a protected interest in her employment for purposes of the defendant's motion, the court must view the facts in the light most favorable to the plaintiff. Cooper does not dispute that the application she signed in 2009 indicated that she agreed that her employment could be terminated "with or without cause, and with or without notice, at any time." (Doc. 30-2, p. 2). However, the plaintiff asserts that she was not an at-will employee for three reasons: (1) the defendant had a progressive discipline policy in the employee handbook that provided procedures that would occur prior to termination, (2) Stockman, the chairman of the Board of Directors, stated that it was a violation of Walker County

59

E-911 policy to fire employees without cause, and (3) Wilson told her that once she completed a 90-day probationary period she would become a permanent employee.[26]

Plaintiff argues, in essence, that the employee handbook created a contract for permanent employment.  The court agrees that the language of the handbook is sufficiently specific to create a unilateral contract like that described in Hoffman-LaRoche.  Section VI.A. of the handbook (Revised 08/08/14) explicitly states:

> All employees hired as full-time will work under the supervision of Rotation Supervisors.  Full-time employees do not have a probationary period.  Very simply, as long as the employee performs up to their job classification, they have a job.  Exceptions would be for disciplinary reasons and budget restraints.

(Sealed Doc. 30-33, at p. 11 of 25).  There can be little question that this provision expressly provided that "full-time employees" retain their employment as long as they perform up to their job classification and do not have disciplinary or budgetary reasons for being dismissed.  In short, there must be "cause" for an employee to be terminated.  There was an offer of permanent employment via the handbook made

---

[26]    The plaintiff did not include any argument regarding her due process claims in her brief opposing the defendant's motion, stating that the issue was "adequately briefed" in her own cross motion.  (Doc. 35, p. 50 n.1).  The court deems the argument to have been incorporated into her brief.

to the plaintiff, she acknowledged the offer by signing the handbook, and she accepted the offer by continuing to work. Taken as a whole, this language, together with the handbook's progressive discipline policy and grievance procedures, is sufficient to establish an entitlement to employment for procedural due process protection and to rebut Walker County E-911's motion for summary judgment.

Cooper's claim further is bolstered by the testimony of Stockman, who stated that it would violate Walker County E-911's "policy" to fire an employee without cause, although Stockman refers to no specific or explicit "policy" in his testimony. Although the defendant argues that Stockman was simply explaining an intention to treat employees fairly, his statement must be viewed in the light most favorable to Cooper for purposes of resolving the defendant's motion, which seems to refer back to the language of the handbook. Stockman's statement, therefore, also provides evidence that the defendant made an offer of permanent employment to Cooper.

Cooper further supports her claim of a property interest in her job by asserting that Wilson told her that, once she completed a 90-day probationary period, she would be fired only for cause. There is no dispute that Wilson's offer was an oral offer of permanent employment.[27] Wilson's statement to the plaintiff, Stockman's

---

[27] The court assumes, for purposes of the defendant's motion, that Wilson made the offer. The defendant has not objected that the alleged statement is hearsay, probably because it likely amounts to an adverse party statement. FRE 801(d)(2).

testimony, and the language of the handbook that indicates that full-time employees do not have a probationary period and have "a job" as long as they perform their duties, are sufficient to support plaintiff's position that she had an employment contract. See Hoffman-LaRoche, 512 So. 2d at 729 (citing more than a dozen cases from "an increasing number of jurisdictions that have given contractual effect to language contained in [employee] handbooks"). Accordingly, the plaintiff has met the first factor of the Hoffman-LaRoche test.

The second factor requires a showing that the agent who made the offer had authority to do so. There is no serious dispute here that Wilson had authority over hiring and firing decisions at Walker County E-911. Even if he did not have actual authority, it is clear that he had apparent authority, which is all that is required under Hoffman-LaRoche. Also, the language of the handbook itself must be regarded as the official policy of Walker County E-911.

As to the third factor of the test, Cooper asserts that she provided consideration in exchange for the offer of permanent employment in that she stayed on the job, although she did not have to. The Alabama Supreme Court noted that "we see no reason why a policy contained in an employee manual issued to an employee cannot become a binding promise once it is accepted by the employee through his continuing to work when he is not required to do so." 512 So. 2d at 733.

The court further noted that "[s]uch a performance clearly provides any consideration necessary to the contract." Id.  In this case, Cooper has stated that she "continue to work there even though she did not have to."  (Doc. 42, p. 6). Accordingly, the third factor of the Hoffman-LaRoche test also is met.

Viewing the facts in the light most favorable to the plaintiff, it could be determined by a reasonable factfinder that the application form covered the terms of a 90-day probationary period and that Wilson made an oral offer of a permanent position to Cooper that was contingent on her completion of  probation.  The application, then, would apply only to her status during the probationary period. The facts also support a determination that the employee handbook provided an offer of permanent employment.  Section VI.A. of the handbook clearly describes permanent employment that can be lost only for specific "disciplinary reasons or budget constraints."  As a result, viewing the facts in the light most favorable to the nonmoving plaintiff, the plaintiff has established that she had a protectable property interest in her continued employment, sufficient to invoke the protections of the federal and state procedural due process clauses.[28]  The defendant's motion for summary judgment as to her due process claims is due to be denied.

---

[28]    The defendant does not assert that the meeting the plaintiff had with Wilson and Walden on October 2 was sufficient to constitute a pre-termination hearing for procedural due process purposes.

## IV. THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The plaintiff seeks summary adjudication of her due process claims on the basis that there is no genuine issue of material fact as to whether she had a property interest in her position and was dismissed without any pre-termination notice or hearing. To determine whether the plaintiff is entitled to partial summary judgment on this claim, the court must view the facts in the light most favorable to the nonmoving defendant.[29]

The defendant has offered evidence that Walker County E-911 expressly notified Cooper that her employment was "at-will" when she filled out the application that informed her that she could be terminated without cause and that no change could be made to that status without a written instrument signed by "the president." If that were the end of the employer's discussions with Cooper on the subject, the employer's version of the facts might prevail. However, it is undisputed that the provisions of the Employee Handbook relied upon by the plaintiff and set forth *supra* were provided to her in August of 2014, the month

---

[29] The defendant seeks to strike portions of plaintiff's reply brief filed in support of her motion for summary judgment, asserting that the plaintiff did not present "waiver" or "modification" arguments in her initial brief in support of the motion. In the alternative, defendant seeks to have its additional arguments, set forth in the motion, considered to rebut the assertions that her employment contract was modified by other statements or actions of the defendant. The motion (doc. 43) is DENIED to the extent that it seeks to strike parts of plaintiff's reply brief, but is GRANTED to the extent that all arguments made by the defendant are considered herein.

before she was terminated.   A juror could reasonably conclude from the handbook language that the "at-will" status no longer applied to full-time employees because the handbook extended the offer of a new employment arrangement, which was accepted by the plaintiff when she continued working under it.   Defendant also is saddled with the testimony of Stockman, who said that firing an employee without cause would violate Walker County E-911 policy.   For purposes of the plaintiff's motion, the court views the Stockman statement in the light urged by the defendant—as a general comment regarding the defendant's desire to treat employees fairly.   Even so, the statement creates a fact dispute about Walker County E-911's policy regarding terminations, and whether the progressive discipline procedures were mandatory.   To take the position that defendant takes—that the application is the final word on Cooper's employment status—renders the employee handbook's language regarding permanency, a disciplinary policy, and a grievance policy meaningless.[30]   Even viewing the facts in the light most favorable to the nonmoving defendant, however, the employer in this case issued "a policy contained in an employee manual" which "may become a

---

[30]       Cooper has further argued that her employment was permanent because the handbook contained a list of reasons that an employee could be terminated.   The list, however, is non-exhaustive, and courts have determined that such lists do not necessarily confer any right of continued employment.   See, e.g., Boyett v. Troy St. Univ. at Montgomery, 971 F. Supp. 1403, 1412 (M.D. Ala. 1997) (citing Blanton v. Griel Mem. Psychiatric Hosp., 758 F.2d 1540 (11th Cir. 1985)).

binding contract once it is accepted by the employee through his continuing to work when he is not required to do so." Lassiter v. Covington, 861 F.2d 680, 684 (11th Cir. 1988).

For all of these reasons, the court finds that the plaintiff has demonstrated that she became a permanent employee—either upon the expiration of 90 days of probationary employment or upon issuance of the handbook. Accordingly, she has met her burden of showing that she had a contract for permanent employment that gives rise to a protected property interest. In its opposition, the defendant's argument rests upon the application form that requires that any change to the at-will status of an employee be in writing and signed by the president. The defendant argues that the employee handbook did not create a binding employment contract, but the case cited by the defendant in support of this argument involved a handbook that specifically reserved to the company "'flexibility and discretion in decisions'" and "'reserve[d] the right to make decisions related to employment in a manner other than as provided in this handbook.'" Stinson v. Amer. Sterilization Co., 570 So. 2d 618, 620 (Ala. 1990). In contrast, the handbook provided by Walker County E-911 specifically states that "[t]he following procedures will be used to regulate personal [sic] matters." (Doc. 30-33, p. 11). That wording appears directly above the language that states that "as long as the employee performs up to their job

classification, they have a job" and reserves as exceptions only "disciplinary reasons or budget restraints."   Id.

The plaintiff supported her motion for summary judgment on the due process claim with evidence that she had a property interest in her job, which the defendant has failed to sufficiently rebut.   Also, the court agrees that Walker County E-911 is not a state agency or "arm of the state" entitled to Eleventh Amendment immunity. Nonetheless, to be entitled to summary judgment in her favor on the due process claims, the plaintiff must establish that she is entitled to judgment as a matter of law. This means that she must establish with undisputed evidence each element of the claim.   It is undisputed that the defendant deprived her of that job without notice and without a pre-termination hearing.   Thus, the only remaining question is whether the failure of Walker County E-911 to give her a pre-termination hearing constituted a violation of her right to procedural due process under either the federal or Alabama state constitutions, or is the availability of post-termination remedies provided by Alabama state law sufficient process to foreclose a claim of denial of due process.   For the reasons already discussed above, the holding in McKinney v. Pate does not apply to this case because the plaintiff was deprived of a *pre*-termination hearing.

While many claims for the denial of procedural due process are not complete and ripe until the state fails to provide a *post*-deprivation remedy, that is not the case when the property interest deprived is public employment. The ability to "cure" a pre-deprivation violation of procedural due process in the context of public employment by providing a post-deprivation remedy was severely limited in Loudermill, in which the Supreme Court stated that a public employee with a property interest in his job must be given an opportunity for a hearing *before* being deprived of employment. 470 U.S. at 542 (quoting Boddie v. Connecticut, 401 U.S. 371, 379, 92 S. Ct. 780, 786, 28 L. Ed. 2d 113 (1971) (emphasis in original)). In some instances, the lack of a pre-termination hearing creates an entitlement to relief that is "complete" upon the termination, without the necessity of showing that the state does not provide an adequate post-deprivation hearing. Courts have broken these claims into two types: those where the employer has not promulgated any *adequate* pre-termination hearing procedures (i.e., there are either no procedures promulgated at all or the procedures promulgated do not comply with the minimum requirements of due process) and those where adequate procedures exist but are disregarded or not followed. The two types of pre-deprivation actions were addressed in Enterprise Fire Fighters' Ass'n v. Watson, in which the district court explained:

The court further concludes that the violation of procedural due process in this case was "complete" when Davis was terminated without a hearing and that the violation was not "cured" by the hearings he received after his termination. In *McKinney*, the Eleventh Circuit noted that "a procedural due process violation is not complete 'unless and until the State fails to provide due process.'" 20 F.3d at 1557 (quoting *Zinermon*, 494 U.S. at 123, 110 S. Ct. at 983). The court further explained that a "state may cure a procedural deprivation by providing a later procedural remedy." *Id*. Thus, in *McKinney*, where a plaintiff alleged that the decisionmaker at a termination hearing was biased, the state may remedy the violation by providing an appeal to an unbiased decisionmaker. By its very nature, however, when the violation of due process is the failure to provide a pretermination hearing, the violation cannot be cured subsequent to termination. The right is lost once termination has been effected. If the rule were otherwise, a public employee's right to a pretermination hearing as explicated in *Loudermill* would be chimerical and ultimately meaningless because it could be "cured" in each instance simply by providing a hearing after termination. Moreover, the violation of due process is complete even if it later appears certain that the termination was substantively correct. *Carey v. Piphus*, 435 U.S. 247, 266, 98 S. Ct. 1042, 1053, 55 L. Ed. 2d 252 (1978).

Enterprise Fire Fighters' Ass'n v. Watson, 869 F. Supp. 1532, 1541 (M.D. Ala. 1994). See also Galbreath v. Hale County, Alabama Comm'n, No. CV 15-308-CG-N, 2017 WL 457197, at *12 (S.D. Ala. Feb. 1, 2017); Poindexter v. Dep't of Human Res., 946 F. Supp. 2d 1278, 1288 (M.D. Ala. 2013); Haddler v. Walker County, Ala., 2014 WL 2465322 (N.D. Ala. May 30, 2014). When a violation of due process becomes "complete" in the context of failure to provide pre-termination procedures was further discussed in Lumpkin v. City of Lafayette:

In support of his contention, Mr. Lumpkin relies on cases in which the courts determined that a plaintiff could state a procedural due process violation under 42 U.S.C. § 1983 without pleading the unavailability or inadequacy of the state's postdeprivation remedies. *See Fetner v. City of Roanoke*, 813 F.2d 1183 (11th Cir.1987); *Enterprise Fire Fighters' Assn. v. Watson*, 869 F. Supp. 1532 (M.D. Ala.1994); *Peacock v. City of Elba*, No. 96–D–755–S (M.D. Ala. March 27, 1997) (DeMent, J.).

In *Fetner*, the court held that a plaintiff who had been dismissed from his position as police chief stated a valid procedural due process claim by alleging that the mayor and city council members failed to give him written notice or a hearing before firing him. *Fetner*, 813 F.2d at 1186. The court rejected the district court's reasoning that a procedural due process claim could be brought in federal court only if no effective procedure for relief exists within the state system. *Id*. at 1184. In addition, the court stated, "Post-deprivation remedies do not provide due process if pre-deprivation remedies are practicable." *Id*. at 1186.

In *Enterprise Fire Fighters' Assn. v. Watson*, the court ruled that a firefighter who was terminated without receiving notice or a hearing stated a procedural due process claim. After determining that due process entitled the plaintiff to a hearing prior to his termination, the court held that the violation of procedural due process was complete when the plaintiff was terminated and could not be cured subsequent to termination. *See Watson*, 869 F. Supp. at 1541. Similarly, the court in *Peacock v. City of Elba* denied summary judgment for a city which terminated the employment of its police chief without providing a pre-termination hearing.

In each of these cases, the plaintiffs were not alleging that the mayor and city council members acted in contravention to an established city procedure setting forth what process was due to public employees. Instead, the plaintiffs were directly challenging procedures which permitted officials to violate an individual's due process rights or the lack of established procedures which gave officials the freedom to violate an individual's due process rights.

> For example, in *Enterprise Fire Fighters' Assn. v. Watson*, Judge Thompson noted that the city officials "did not act in contravention to established procedures, but pursuant to such established procedures.... [T]he very fact that the procedures were adhered to by city officials is what caused the due process violation." *Watson*, 869 F. Supp. at 1540. Judge DeMent wrote in *Peacock* that "the plaintiff alleges that he received no pre-deprivation review. That is, the plaintiff challenges the review system (or lack thereof), a procedural protection over which the State has control, rather than simply challenging the system as it was applied to him." *Peacock*, No. 96–D–755–S, at 8.
>
> If Mr. Lumpkin had alleged that the mayor and council members acted pursuant to the city's procedures, or in the absence of any procedures, the violation of his procedural due process rights would have been complete at the moment of his termination, assuming that due process entitled him to notice and a hearing. That is not what Mr. Lumpkin alleges. Mr. Lumpkin does not attack the City of Lafayette's established procedure. He asserts that the mayor and council members ignored the city's established procedure when they eliminated his position without notice or a due process hearing.

<u>Lumpkin</u>, 24 F. Supp. 2d 1259, 1264–65 (M.D. Ala. 1998). Thus, whether a procedural due process claim is completely accrued and ripe for action at the time of termination depends on whether adequate pre-termination procedures existed. If adequate procedures exist, but are ignored by the employer, there is a post-deprivation remedy available to compel the employer to follow the procedures. If, however, there are no adequate pre-termination procedures promulgated by the employer, there is no post-termination remedy that can cure the due process violation (i.e., a state *certiorari* action cannot compel an employer to comply with

procedures that do not exist or which are constitutionally inadequate to provide due process, even if followed). In this latter instance, the due process violation is complete, accrued, and ripe upon the termination of the employee.

The issue of whether a post-deprivation process by which a plaintiff can seek review of an alleged procedural due process violation precludes relief in a §1983 action was answered by another court within this district in <u>Hicks v. Jackson County Comm'n</u>, 374 F. Supp. 2d 1084, 1092 (N.D. Ala. 2005). In <u>Hicks</u>, Judge Smith noted that it has been recognized that state courts in Alabama "'review employment termination proceedings both to determine whether they are supported by substantial evidence and to see that the proceedings comport with procedural due process.'" 374 F. Supp. 2d at 1092 (quoting <u>Bell v. City of Demopolis</u>, 86 F.3d 191, 192 (11th Cir. 1996)). The court further noted that "[t]his is not to say that post-deprivation remedies will *always* be sufficient to remedy the deprivation of property rights," if no hearing was held prior to the deprivation. 374 F. Supp. 2d at 1091 (citing <u>Lumpkin v. City of Lafayette</u>, 24 F. Supp. 2d 1259 (M.D. Ala. 1998) (emphasis in original). The court further explained that Supreme Court precedent provides that "'an *unauthorized* intentional deprivation'" can be remedied with post-deprivation opportunities, as distinct from a deprivation that is caused by "either an established procedure or the absence of an established procedure." <u>Hicks</u>, 374 F. Supp. 2d at

1091-92 (quoting Hudson v. Palmer, 468 U.S. 517, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)). A post-deprivation procedure will suffice, the court determined, where the plaintiff's complaint is that the termination "*contravened* the established procedure." 374 F. Supp. at 1092.

In this case, Cooper alleges that the Walker County E-911 terminated her employment "without giving Cooper notice of the charges against her, an explanation of the evidence against her, and without allowing Cooper an opportunity to be heard and to present her side of the story to an impartial hearing officer." (Amended Comp. Doc. 1, ¶¶ 80, 85). In sum, she alleges that the defendant did not have in place any procedures to safeguard her due process rights, or that the procedures were inadequate. Reviewing the employee handbook, including the progressive discipline policy and the grievance policy, the procedures were constitutionally insufficient to meet the minimum requirements of due process, even though they also were simply ignored or contravened by Wilson and Walden.[31] For example, section "XIV. Disciplinary Procedures," states under subsection "F. Dismissals," only "1. Dismissals are used for extreme neglect to duty, conduct unbecoming an employee of Walker County E-9-1-1, or extreme or continued

---

[31] The court believes this case involves a "complete" violation of due process without regard to the availability of post-termination remedies because the promulgated procedures themselves were constitutionally inadequate. Even if Wilson and Walden had followed the procedures, they did not provide pre-termination notice and hearing, and were therefore constitutionally insufficient.

violations of rules."   (Doc. 30-33, p. 19 of 25).   There are no stated procedures for the enforcement of discipline.   The handbook does not describe how the employee is notified of a disciplinary allegation or how the employee may challenge the accuracy of the allegation.   Under section "XV. Grievance Procedures," the handbook states:

> It is the policy of Walker County E9-1-1 to resolve grievances in a fair and equitable manner.  No employee will be penalized or retaliated against for filing a grievance.
>
> **A.   Purpose**
>
>    1.   The grievance procedure is to permit eligible employees equal access to those individuals who make decisions concerning personnel matters, and to provide a standard process for the prompt investigation and resolution of employee complaints.
>    2.    The grievance procedure will not be used to resolve differences among employees of similar rank or grade.
>
> **B.   Definition**
>
>    1.   A grievance is a statement of an employee that a supervisor or E9-1-1 official has improperly or prejudicially applied or failed to apply, the personnel rules, regulations, or procedures of Walker County E9-1-1.
>
> **C.   Filing a Grievance**
>
>    1.   Within five (5) working days after an employee knows, or should have known, of a grievance matter, the employee may submit a written grievance to the Director.

2.  The Director or his designee will provide the employee an answer in writing within five (5) working days of receipt of the grievance.

3.  An employee may be represented by a person of the employee's choosing at any step in the process.

4.  A grievance may be withdrawn at any step in the process.

**D.  Appeal of Decision**

1.  If the employee is not satisfied with the Director's response, a written appeal may be filed with the E9-1-1 Board of Directors, through the Director.

2.  The Board of Directors may conduct any hearings, interviews, or review of any written reports, as they deem necessary to resolve the appeal.

3.  The Board will reply in writing to the employee writing ten (10) working days of receipt of the appeal.

4.  The decision of the Board is final and binding on all parties.

(Doc. 30-33, p. 20 of 25).    There are no other provisions in the handbook that touch on disciplinary procedure or termination procedures.

These procedures are plainly inadequate to the meet the minimum due process requirements of notice of the charge, a chance to the review the evidence supporting the disciplinary charge, and a chance to be heard on the allegation.    In none of the promulgated procedures does the defendant provide for such due process procedures *prior* to the termination of an employee.    Hence, the promulgated procedures themselves are constitutionally inadequate to comply with due process in the public employment context.    The plaintiff's due process claim, therefore, was completely

accrued and ripe at the time of her termination. There was no necessity that she show the absence of any *post*-termination remedies under Alabama law.

## IV. CONCLUSION

For all of the reasons set forth herein, the defendant's motion for summary judgment on all of plaintiff's claims (doc. 23) is due to be DENIED IN PART and GRANTED IN PART. To the extent that the defendant seeks summary adjudication of plaintiff's claim that she was denied a reasonable accommodation under the ADA and that the defendant interfered with her FMLA leave, the motion is due to be GRANTED, and these claims will be DISMISSED WITH PREJUDICE. As to all other claims, the defendant's motion is due to be DENIED.[32]

The plaintiff's motion for partial summary judgment on her procedural due process claim (doc. 31) also is due to be GRANTED, subject to a trial on an appropriate equitable and/or damages remedy.

---

[32] For sake of clarity, the following claims remain pending: Count II—FMLA retaliation; Count IV—ADA discriminatory termination; Count V—denial of procedural due process under the Alabama Constitution; and Count VI—denial of procedural due process under the Fourteenth Amendment to the United States Constitution.

A separate order will be entered.

DATED this 26th day of July, 2018.

T. MICHAEL PUTNAM
UNITED STATES MAGISTRATE JUDGE